

# COURT OF APPEALS

## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-09-00249-CV

ELIZABETH ANN LINDLEY, NOT
INDIVIDUALLY, BUT SOLELY IN
HER CAPACITY AS
INDEPENDENT EXECUTOR OF
THE ESTATE OF NAN DAWS,
DECEASED

APPELLANT

V.

J. ROSS MCKNIGHT, PAUL
COWAN, PRYOR COWAN, JEFF
M. GLAZNER, JANICE A.
GLAZNER, JOHN E. GRAY,
RAELYNN GRAY, WILLIAM T.
HANNIS, KOBYE HANNIS, SCOTT
HARRIS, LINDA HARRIS,
WILLIAM H. HENSON, DEE ANN
HENSON, EDWIN M. HINSON,
SUSAN K. HINSON, JACK B.
HORNE, CAROLE HORNE,
PASCAL J. HOSCH, JOYCE
HOSCH, LARRY O. HULSEY,
GAYLE HULSEY, DONALD R.
JOHNSTON, TERESA
JOHNSTON, BOBBY KING, SUE
KING, MARK MARTIN, CONNIE
MARTIN, ROBERTA MONDEN,
MIKE MONDEN, JAMES B.
MYERS, LEANN MYERS, MIKE
PARRACK, DORENE PARRACK,

APPELLEES

CHARLES PRIBYLA, MONA PRIBYLA, GENEVA C. RODGERS, SCOTT W. SEWELL, GINA E. SEWELL, TOMMY SLOAN, SUSAN SLOAN, BILL SNEED, VIRGINIA SNEED, TED TAYLOR, SONJA TAYLOR, JAMES SLOAN THOMPSON, DIANE THOMPSON, ALLEN E. TURNER, NAVALLEVE TURNER, JAMES BRUCE WATERFIELD, SANDRA WATERFIELD, DAVID A. WATSON, BETTY J. WATSON, THROCKMORTON BANCSHARES, INC., OLNEY BANCSHARES OF TEXAS, INC., BRYAN ROBERTSON KEY, CANDYCE CAYE KEY, JOE MICHAEL BELLAH, ELIZABETH BROWN BELLAH, DONNELL THOMAS BROWN, KELLI EVANS BROWN, TODD CHARLES MCCARTNEY, MARIANNE BROWN MCCARTNEY, R. A. BROWN, JR., PEGGY DONNELL BROWN, ROBERT ALFRED BROWN, TALLEY BROWN, A. DONALD CHANDLER, JOY CORNELIUS CHANDLER, J. M. CHANDLER, MARY GENE CHANDLER, JOHN TARKINGTON SCHRAMPFER, LEREY DAWS COKER SCHRAMPFER, NEL REY DAWS COKER, STANTON DOW LILES, III, GRETA NELSON LILES, BILLIE GASKINS MCKNIGHT, WILMA OPGENORTH MCKNIGHT, TERRELL CONDRON REDWINE, BETTYE G. REDWINE, RONNIE DUANE CAPPS, TRUDY CAPPS, MARK MCCLELLAND, GAY L. MCCLELLAND, JIM MYERS,

LEMUEL KYLE YEATES,
DEBORAH LYNN SHELLEY,
TOMMY BOYD, LADELL BOYD,
DON ROSS COMPTON, AND
MARGIE COMPTON

------------

FROM THE 30TH DISTRICT COURT OF WICHITA COUNTY

------------

**OPINION**

------------

In five issues, appellant Elizabeth Ann Lindley, not individually, but solely in her capacity as independent executor of the estate of Nan Daws, deceased (Lindley), appeals the trial court's final judgment in favor of appellees J. Ross McKnight, Throckmorton Bancshares, Inc. (Throckmorton), Olney Bancshares of Texas, Inc. (Olney), and the remaining appellees listed above. Lindley contends that the trial court erred by denying her motion for summary judgment, granting appellees' motions for summary judgment, making allegedly incorrect rulings on the parties' objections to summary judgment evidence, and awarding more than $200,000 in attorney's fees to appellees. We affirm.

**Background Facts**

Throckmorton and Olney are holding companies that purchase and own affiliated or unaffiliated banks. McKnight is the chairman of the board and president of Throckmorton, and he is the president of Olney. He owns stock in

3

both corporations. Daws was one of the initial shareholders of Olney (investing $25,000), which was formed to acquire the First National Bank of Olney and later acquired seven other banks. She also owned significant stock in Throckmorton, which owns only the First National Bank of Throckmorton. Lindley is Daws's niece.

McKnight and Daws are distant relatives. Daws's husband, Jim Bob, was once the chairman of the First National Bank of Throckmorton. McKnight has lived in the city of Throckmorton his entire life except when he attended college. He was raised next door to the Dawses and lived close to them until he went to college. He considered them to be friends.

In 1996, Throckmorton and Olney considered conversions to S corporations.[1] In November of that year, McKnight sent a letter to Olney's shareholders stating that to complete the conversion, they needed to all agree to it through an IRS election form and a shareholders' agreement.

The Throckmorton shareholders' agreement, which was revised and approved by the corporation's attorney, Richard Dale Craig, contains the following provisions, among others:

---

[1]*See generally* 26 U.S.C.A. §§ 1361–1363 (West 2011); *see also Thomas v. Thomas*, 738 S.W.2d 342, 344 (Tex. App.—Houston [1st Dist.] 1987, writ denied) (explaining that Subchapter S status "provides an alternate method to tax the corporation's income"). A disclosure memorandum sent by Olney to its shareholders in November 1996 explains that a Subchapter S election allows a corporation's income to be passed through to shareholders' individual income tax returns.

4

## SHAREHOLDERS AGREEMENT

THIS AGREEMENT made effective the 1st day of January, 1997, by and among Throckmorton Bancshares, Inc., a Texas corporation (the "Corporation") and the undersigned shareholders of the Corporation and their respective spouses (the "Original Shareholders").

. . . .

WHEREAS, the Corporation intends to file an election to be taxed as an S corporation under the Internal Revenue Code of 1986, as amended with the consent of the Original Shareholders; and

WHEREAS, the Original Shareholders, acting for themselves and for all persons who subsequently may become shareholders of the Corporation (the "Shareholders"), and the Corporation wish to keep the election in force until it is revoked pursuant to this Agreement.

NOW, THEREFORE, the Original Shareholders and the Corporation agree as follows:

Section 1.  Voluntary Transfer of Stock.  No Shareholder shall transfer stock of the Corporation by sale, gift, assignment, pledge, or other voluntary disposition or encumbrance unless he shall have provided the Corporation, at least thirty (30) days prior to the proposed transfer, with a written statement (the "Notice") regarding the identity of the proposed transferee sufficient to satisfy the Corporation that (a) the proposed transferee is an eligible S corporation shareholder and (b) the proposed transfer will not cause the record number of Shareholders of the Corporation to exceed thirty-two (32).  Such proposed transfer may be effected by the Shareholder only if the Corporation approves the transfer in accordance with Section 3 below.  Any transfer of stock of the Corporation that is not described in this Section 1 as a voluntary transfer shall be considered an involuntary transfer subject to the provisions of Section 2 below.

Section 2.  Involuntary Transfer of Stock.   In the event any Shareholder:

(a) dies;

. . . .

and, as a result of such event, the stock of the Corporation owned by that Shareholder is subject to being transferred, . . . the Shareholder shall be deemed, when the identity of the proposed transferee is established, to have given Notice, as defined under Section 1 hereof, except that the Corporation shall not be deemed to have received such Notice until the Corporation has actual knowledge of the event and the identity of the proposed transferee.

Section 3. Approval by the Corporation. Within twenty (20) days of the receipt of a Notice required by Section 1 hereof, the Corporation shall advise the Shareholder who provided the Notice whether the Corporation approves the transfer. The Corporation may, in its sole discretion, approve or disapprove any proposed transfer, except that the Corporation shall withhold its approval of any proposed transfer if (a) it would cause or reasonably could cause the Corporation's S status to terminate or (b) it would cause the record number of Shareholders of the Corporation to exceed thirty-two (32).[2]

Section 4. Effect of Noncompliance. In the event of any purported or attempted transfer of stock that does not comply with the provisions of this agreement, the purported transfer shall be void and the purported transferee shall not be deemed to be a Shareholder of the Corporation and shall not be entitled to receive a new stock certificate or any dividends or other distributions on or with respect to the stock.

Section 5. Redemption of Shares. If a Shareholder attempts to transfer stock of the Corporation in a manner that does not comply with the provisions of this Agreement, the shares purported to be transferred shall, at the Corporation's option, be deemed to be redeemed immediately before the occurrence of the attempted transfer. If the Corporation exercises its option to redeem shares, the amount to be paid therefor shall be their book value . . . as of the

---

[2]The number of shareholders was limited to thirty-two because a state law provision would have included executive officers' salaries in the calculation of franchise tax if there were more than thirty-five shareholders.

end of the fiscal year immediately preceding the redemption . . . , which amount shall be payable in cash.[3]

Daws signed both corporations' shareholders' agreements. McKnight asserted through an affidavit that the goals of the transfer restrictions were to protect the corporations' anticipated Subchapter S status, minimize franchise taxes, promote ownership by shareholders who contributed to the success of the banks owned by the corporations "in some way other than indirect ownership," and comply with various "federal and state banking requirements, which may from time to time affect bank ownership."[4]

All of the corporations' shareholders had to consent to Subchapter S status for the conversions to occur.[5] Craig explained that new legislation had been passed that permitted financial institutions to become S corporations effective in 1997. He also said that a corporation could not qualify for Subchapter S status if

---

[3]The Olney shareholders' agreement contains provisions that are substantially similar to those in the Throckmorton agreement. The reference in section three of the Throckmorton agreement to the mandated disapproval of a transfer if "it would cause the record number of Shareholders of the Corporation to exceed thirty-two" is changed in the Olney agreement to state that disapproval must occur if "it would be a violation of Section 7.05(b) of the Corporation's Bylaws." That section, as effective on December 1, 1996, states that except on the written consent of the Olney board, the corporation's number of shareholders could not exceed fifty.

[4]As Lindley argued in the trial court, the corporations' bylaws do not dictate that the corporations' shareholders be customers of the corporations' banks or otherwise contribute to them. Nor do the bylaws require shareholders to be residents of the counties in which the corporations or banks are located.

[5]*See* 26 U.S.C.A. § 1362(a)(2).

it had more than seventy-five shareholders.[6] Craig conceded that federal law does not require S corporations to have shareholders' agreements. He explained, however, that such agreements are helpful to protect Subchapter S status because the agreements may prevent shareholders from exceeding seventy-five or from transferring stock to an impermissible shareholder, such as another corporation. Craig said,

> It's extremely easy to have an inadvertent termination of an S election. And one of the reasons that you have a shareholders['] agreement is to help put you in the best position to argue with the IRS that there wasn't an impermissible transfer, that there are contractual restrictions that prevent that. . . .

> . . . [I]t's never a position that one wants to be in to ask for forgiveness from the IRS.

Daws died on June 25, 2000 (years after signing the shareholders' agreements), at which time she owned over 25% of the shares of Throckmorton's stock, making her the corporation's largest shareholder. She was a minority shareholder in Olney. She also had a checking account with the First National Bank of Throckmorton that contained approximately $100,000. Daws's will named Lindley as independent executor and bequeathed all of the residuary estate (including almost all of the stock) to her.

In August 2000, Lindley was officially appointed as the independent executor of Daws's estate, and a Wichita County court admitted Daws's will to

---

[6]Today, an S corporation may have up to 100 shareholders. *See id.* § 1361(b)(1)(A).

probate. During meetings occurring that same month, McKnight advised the corporations' boards of directors that the corporations had received a copy of Daws's will on July 26, 2000. The minutes of the Throckmorton meeting state that McKnight noted that "under the terms of the Shareholders['] Agreement, Mrs. Daws'[s] death constituted an 'involuntary transfer' of her stock in the Corporation," and the company had the "sole discretion to approve or disapprove" the attempted transfer. The minutes then explain that the directors recognized

> the benefit to the Corporation and its subsidiary bank of having local ownership and the support which the local shareholders gave to the bank. It was further noted that while the number of the Corporation's shareholders was less than the maximum permitted under the Corporation's Bylaws, it was still desirable not to increase the number of shareholders.
>
> . . . It was . . . recommended that the Board of Directors disapprove the transfer to [Lindley], and that the stock be redeemed in accordance with the terms of the Shareholders['] Agreement.

Thus, the Throckmorton board disapproved the transfer of ninety-two shares of stock to Lindley and voted that those shares be redeemed through a payment of the book value of the stock as of December 31, 1999.[7] The Olney board took a similar action as reflected in minutes from its August 2000 meeting; the minutes state that corporation redeemed 625 shares of Olney stock that Daws attempted to transfer to Lindley.

---

[7]Lindley still has the original certificate for Daws's Throckmorton shares. She says that she "refused to return it after being notified in October 2000" that Throckmorton had redeemed the shares.

9

On August 11, 2000, Bruce Crum, an attorney for the corporations, sent a letter to Lindley informing her of the disapproved transfer and redemption of the shares. Crum expressed that he included copies of audited financial statements for the corporations and that he also sent the letter to Daws's estate's counsel. Ten days later, Crum sent a letter to the estate's counsel that enclosed the corporations' bylaws and the minutes of the meetings that had occurred that month.

Lindley sued McKnight, Throckmorton, Olney, and Throckmorton's and Olney's shareholders.[8] Lindley asserted that appellees had implemented unenforceable shareholders' agreements. She sought declarations, under the Uniform Declaratory Judgments Act (UDJA),[9] that the agreements were unreasonable and void and that appellees had failed to comply with them. She also alleged that McKnight had breached a fiduciary duty to Daws by failing to disclose the legal effect of the agreements upon her estate, that appellees were liable for common law fraud and statutory fraud based on alleged misrepresentations about the necessity and legal effect of the agreements, and

---

[8]Lindley referred to McKnight, Throckmorton, and Olney as "Defendants"; she referred to the shareholders as "Respondents." She included some appellees in her original petition and added others to the suit at a later time; for simplicity, we will refer to the parties that Lindley sued in December 2000 as "appellees," and we will use the term "appellees" to refer to actions taken by McKnight, Throckmorton, and Olney even if the other appellees did not explicitly join the actions.

[9]See Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001–.011 (West 2008).

10

that appellees breached section three of the agreements by failing to reject the stock transfers to her within twenty days of receiving knowledge that she was the proposed transferee.[10] Lindley sought compensatory damages for the difference between the book value and fair market value of Daws's stock and for dividends and distributions on the stock to which she claimed to be entitled.[11] She also asked for exemplary damages and attorney's fees.

Appellees filed answers that included general denials[12] and defenses. Appellees sought declaratory relief about the validity of the shareholders' agreements, asserting that they were reasonably drafted to keep local ownership and ensure the viability of independent community banks. Appellees also asked the trial court to award attorney's fees.

Approximately five years after filing the suit, Lindley filed a motion for partial summary judgment on her claim that the agreements were void as a

---

[10]Lindley said in an affidavit that Bryan Robertson Key, the secretary of Throckmorton and president of the First National Bank of Throckmorton, read Daws's will. Lindley asserts that the corporations received notice of her identity as the proposed transferee of Daws's stock when Key read the will and that the corporations improperly rejected the transfer more than twenty days later.

[11]In her pleading, Lindley did not specify the amount of damages that she requested.

[12]In his original answer, McKnight specifically denied that he visited Daws in a hospital "or did anything to cause her to sign the Shareholders['] Agreements." Lindley testified in a deposition that McKnight visited Daws in 1996 to obtain Daws's signature on "papers"; McKnight testified that he visited her in December of that year to obtain a proxy so that her Throckmorton shares could be voted, but he did not recall discussing specific terms of the shareholders' agreements with her at that time.

11

matter of law because they unreasonably restricted the transfer of stock. Appellees responded to Lindley's motion and filed a no-evidence motion for summary judgment on Lindley's claims. Appellees also filed a traditional motion for partial summary judgment on their affirmative defenses. Lindley responded to both of appellees' motions. With leave of court, appellees filed supplements to their traditional motion for summary judgment; the supplements contended, among other arguments, that Lindley was estopped from challenging the shareholders' agreements.

The trial court denied Lindley's motion for partial summary judgment and granted appellees' motions for summary judgment. Lindley brought this appeal.

## Summary Judgment Standards

We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). We must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented. *See Wal-Mart Stores, Inc. v. Spates*, 186 S.W.3d 566, 568 (Tex. 2006); *City of Keller v. Wilson*, 168 S.W.3d 802, 822–24 (Tex. 2005).

12

When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both parties' summary judgment evidence and determine all questions presented. *Mann Frankfort*, 289 S.W.3d at 848; *see Myrad Props., Inc. v. Lasalle Bank Nat'l Ass'n*, 300 S.W.3d 746, 753 (Tex. 2009). When a party moves for both a traditional and a no-evidence summary judgment, we generally first review the trial court's summary judgment under no-evidence standards. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004); *All Am. Tel., Inc. v. USLD Commc'ns, Inc.*, 291 S.W.3d 518, 526 (Tex. App.—Fort Worth 2009, pet. denied). "When the trial court does not specify the basis for its summary judgment, the appealing party must show it is error to base it on any ground asserted in the motion. The appellate court must affirm the summary judgment if any one of the movant's theories has merit." *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995) (citations omitted).

**Traditional motions for summary judgment for or against claims or defenses**

In a traditional summary judgment case, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Mann Frankfort*, 289 S.W.3d at 848. The summary judgment will be affirmed only if the record establishes that the movant has conclusively proved all essential elements of the movant's cause of action or

13

affirmative defense. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979); *see Chau v. Riddle*, 254 S.W.3d 453, 455 (Tex. 2008). If uncontroverted evidence is from an interested witness, it does nothing more than raise a fact issue unless it is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted. Tex. R. Civ. P. 166a(c); *Morrison v. Christie*, 266 S.W.3d 89, 92 (Tex. App.—Fort Worth 2008, no pet.).

**No-evidence motions for summary judgment**

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. Tex. R. Civ. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.*; *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. *See* Tex. R. Civ. P. 166a(i); *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied*, 541 U.S. 1030 (2004).

## Appellees' No-Evidence Motion for Summary Judgment

In her third issue, Lindley contends that the trial court erred by granting appellees' no-evidence motion for summary judgment on her claims for breach of fiduciary duty, fraud, statutory fraud, breach of contract, and declaratory judgment. Because we will hold below that one of appellees' affirmative defenses precludes Lindley's recovery on her breach of contract and declaratory judgment claims as a matter of law, we will examine only whether the trial court correctly granted appellees' no-evidence summary judgment motion on the breach of fiduciary duty, fraud, and statutory fraud claims.

### Breach of fiduciary duty

Lindley pled that McKnight breached a fiduciary duty to Daws by allegedly causing her to sign the shareholders' agreements. "The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant, (2) a breach by the defendant of his fiduciary duty to the plaintiff, and (3) an injury to the plaintiff or benefit to the defendant as a result of the defendant's breach." *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.— Houston [14th Dist.] 2008, pet. denied). Appellees moved for summary judgment on the basis that there is no evidence of any of these elements.

The effect of imposing a fiduciary duty is to require the fiduciary party to place someone else's interests above its own. *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992), *superseded by statute on other grounds as stated in Subaru of Am., Inc. v. David McDavid*

15

*Nissan, Inc.*, 84 S.W.3d 212, 225–26 (Tex. 2002) (op. on reh'g). Thus, Texas courts are reluctant to recognize fiduciary relationships. *See Jones v. Thompson*, No. 08-08-00245-CV, 2010 WL 3157145, at *8 (Tex. App.—El Paso Aug. 11, 2010, pet. denied).

Generally, "[a] director's fiduciary duty runs only to the corporation, not to individual shareholders or even to a majority of the shareholders*." Somers ex rel. EGL, Inc. v. Crane*, 295 S.W.3d 5, 11 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (quoting *Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex. App.— Houston [14th Dist.] 1997, pet. denied)); *see Redmon v. Griffith*, 202 S.W.3d 225, 233 (Tex. App.—Tyler 2006, pet. denied). As we have explained,

> While corporate officers owe fiduciary duties to the corporation they serve, they do not generally owe fiduciary duties to individual shareholders unless a contract or confidential relationship exists between them in addition to the corporate relationship. Due to its extraordinary nature, the law does not recognize a fiduciary relationship lightly. Therefore, whether such a duty exists depends on the circumstances.

> Fiduciary duties may arise from formal and informal relationships and may be created by contract. An informal fiduciary duty may arise from a moral, social, domestic, or purely personal relationship of trust and confidence, generally called a confidential relationship. A confidential relationship exists where influence has been acquired and abused and confidence has been extended and betrayed. A person is justified in placing confidence in the belief that another party will act in his best interest only where he is accustomed to being guided by the judgment or advice of the other party and there exists a long association in a business relationship as well as personal friendship. Thus, the relationship must exist prior to and apart from the agreement that is the basis of the suit. And, although a confidential relationship is ordinarily a question of fact for the jury, it becomes a question of law when the trial court refuses to submit issues on fiduciary duty based on no evidence.

16

*Cotten v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 698 (Tex. App.—Fort Worth 2006, pet. denied) (footnotes and citations omitted); *see Rice v. Metro. Life Ins. Co.*, 324 S.W.3d 660, 679 (Tex. App.—Fort Worth 2010, no pet.) (upholding a trial court's summary judgment against a breach of fiduciary duty claim because the appellant did not present more than a scintilla of evidence of a "special relationship of confidence and trust"); *see also Meyer v. Cathey*, 167 S.W.3d 327, 329, 331 (Tex. 2005) (declining to recognize a fiduciary relationship when, among other facts, the plaintiff and defendant were friends who ate lunch together every day for four years); *Crim Truck & Tractor Co.*, 823 S.W.2d at 595 (explaining that "[n]either is the fact that the relationship has been a cordial one, of long duration, evidence of a confidential relationship").

In the trial court, Lindley asserted that an informal, confidential relationship existed between McKnight and Daws because

> McKnight lived next door to [Daws] as a child and teenager; he worked as a young man for [Daws's] husband . . . ; he assisted [Daws] in business transactions after her husband died . . . ; [Daws] relied upon [McKnight] to act in her best interest; and [McKnight] was a pallbearer at [Daws's] funeral.

In Lindley's affidavit, she said,

> I know that [Daws] had a close personal and confidential relationship with [McKnight]. She often spoke of it. I know of several occasions on which [Daws] sought the advice and counsel of [McKnight] in connection with her financial affairs. I know that he advised her in connection with at least one oil and gas lease that she entered into, and that he assisted her in negotiating her royalty interest in that lease. I also know that [McKnight] would seek [Daws's] counsel in connection with the affairs of the First National Bank of Throckmorton because she was the largest single

17

shareholder in that bank. At the time that [McKnight] was seeking to form [Olney] in the late 1980's [sic], he approached [Daws] and sought to get a substantial investment from her in that company after he had initially inquired as to whether she would oppose his using [Throckmorton] as the entity that would acquire the various failed banks which ultimately became the banks owned by [Olney]. [Daws] refused to let him use Throckmorton for that purpose, but told him that she would invest with him if he acquired those banks using a different entity . . . .

I know that [Daws] trusted [McKnight] to do the right thing for her, the banks[,] and their shareholders, since [Daws's] husband Jim Bob Daws had been the Chairman of the Throckmorton bank for many years prior to [McKnight's] ever becoming involved as an employee or officer or shareholder of that bank.

Appellees argue that "[c]onsidering only the competent and admissible evidence . . . , Lindley falls short of raising a material fact issue on the existence of a fiduciary relationship." In the trial court, appellees objected to statements in the paragraphs quoted above on the grounds that various parts of the paragraphs were based on hearsay, contained conclusory statements, and violated rule 601 of the rules of evidence.[13] The trial court sustained these objections. In her fourth issue, Lindley challenges the trial court's decision to sustain the objections.

We review a trial court's evidentiary rulings related to a motion for summary judgment for an abuse of discretion. *Cantu v. Horany*, 195 S.W.3d 867, 871 (Tex. App.—Dallas 2006, no pet.); *Reynolds v. Murphy*, 188 S.W.3d

---

[13]In lawsuits brought by executors, neither party "shall be allowed to testify against the others as to any oral statement by the testator . . . unless that testimony to the oral statement is corroborated or unless the witness is called at the trial to testify thereto by the opposite party." Tex. R. Evid. 601(b).

18

252, 259 (Tex. App.—Fort Worth 2006, pet. denied), *cert. denied*, 549 U.S. 1281 (2007). When a trial court acts "without regard for any guiding rules or principles," it abuses its discretion. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). We may not conclude that a trial court abused its discretion merely because we would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).

Lindley bears the burden of bringing forth a record that demonstrates the trial court abused its discretion when it sustained appellees' objections to the summary judgment evidence. *See Cantu*, 195 S.W.3d at 871. We must uphold the trial court's evidentiary rulings if there is any legitimate basis in the record for the rulings. *Reynolds*, 188 S.W.3d at 259.

A summary judgment affidavit must be based on personal knowledge, show that the affiant is competent to testify, and contain facts that would be admissible in evidence at trial. *See* Tex. R. App. P. 166a(f); *United Blood Servs. v. Longoria*, 938 S.W.2d 29, 30 (Tex. 1997); *Souder v. Cannon*, 235 S.W.3d 841, 849 (Tex. App.—Fort Worth 2007, no pet.). Conclusory statements are not proper summary judgment proof. *See McIntyre v. Ramirez*, 109 S.W.3d 741, 749 (Tex. 2003); *Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996) ("Conclusory affidavits are not enough to raise fact issues. . . . They are not credible, nor susceptible to being readily controverted."); *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984) (same). A conclusory statement is one that

19

does not provide the underlying facts to support the conclusion. *Souder*, 235 S.W.3d at 849; *Residential Dynamics, LLC v. Loveless*, 186 S.W.3d 192, 198 (Tex. App.—Fort Worth 2006, no pet.).

For example, in *Seaway Products Pipeline Co. v. Hanley*, an affidavit stated that a defendant "indicated he was involved . . . in the development of . . . property." 153 S.W.3d 643, 653 (Tex. App.—Fort Worth 2004, no pet.). We held that the statement was conclusory because it did not "set[] forth the facts to support what [the defendant] did to 'indicate' that he was involved . . . in developing the property." *Id.* at 654; *see also Cammack the Cook, L.L.C. v. Eastburn*, 296 S.W.3d 884, 895 (Tex. App.—Texarkana 2009, pet. denied) (reasoning that an affidavit was conclusory because it alleged that a plaintiff's attorney's fee calculation was unreasonable but did not provide a factual basis to make that claim); *Haynes v. City of Beaumont*, 35 S.W.3d 166, 178 (Tex. App.—Texarkana 2000, no pet.) (holding that affidavits were conclusory when they stated that an employee was terminated for "poor and unacceptable behavior" without disclosing examples of such behavior).

Appellees' objections to the conclusory nature of Lindley's affidavit related (in part) to the following statements:

> I know that [Daws] had a close personal and confidential relationship with [McKnight]. She often spoke of it. I know of several occasions on which [Daws] sought the advice and counsel of [McKnight] in connection with her financial affairs. . . . I also know that [McKnight] would seek [Daws's] counsel in connection with the affairs of First National Bank of Throckmorton because she was the largest single shareholder in that bank. . . .

20

I know that [Daws] trusted [McKnight] to do the right thing for her, the banks and their shareholders, since [Daws's] husband Jim Bob Daws had been the Chairman of the Throckmorton bank for many years prior to [McKnight's] ever becoming involved as an employee or officer or shareholder of that bank.

Assuming that these general statements are intended to stand independently from the remaining, more specific parts of Lindley's affidavit that discuss Daws's relationship with McKnight, we conclude that the trial court could have reasonably determined that the statements do not contain sufficient factual detail to qualify as proper summary judgment proof. Lindley failed to provide details about *what* Daws said to lead Lindley to believe that a "close personal and confidential relationship" existed between Daws and McKnight, *what* matters Daws sought McKnight's counsel about, *how* Lindley knew that Daws had sought his counsel, *what* matters McKnight sought Daws's counsel about, *how* Lindley knew that he had sought Daws's counsel, *how* Lindley knew that Daws trusted McKnight to "do the right thing for her,"[14] or *why* Daws's husband's role with the Throckmorton bank affected whether Daws trusted McKnight. Thus, we hold that the trial court did not abuse its discretion by sustaining appellees' objections to at least these statements, and we overrule Lindley's fourth issue to that extent. *See Reynolds*, 188 S.W.3d at 259.

---

[14]Subjective trust does not transform a business arrangement into a fiduciary relationship. *Meyer*, 167 S.W.3d at 331; *Pabich v. Kellar*, 71 S.W.3d 500, 505 (Tex. App.—Fort Worth 2002, pet. denied) (op. on reh'g).

21

We do not need to determine whether the trial court erred by sustaining appellees' objections to Lindley's remaining statements regarding Daws's relationship with McKnight because we conclude that those statements, along with the other evidence submitted by Lindley, do not raise a genuine issue of material fact to establish a fiduciary duty owed by McKnight. *See* Tex. R. App. P. 47.1; *Reynolds*, 188 S.W.3d at 259. Specifically, we conclude that the following facts do not amount to more than a scintilla of evidence to establish a confidential relationship:

- McKnight was Daws's distant relative (McKnight hesitantly said that he believed that Daws's husband, who died several years before the events relevant to this case, was his third or fourth cousin);

- McKnight gratuitously advised Daws *and other women* in connection with oil and gas matters that are unrelated to the corporations or the issues involved in this case (his assistance was not special to Daws);[15]

- McKnight once approached Daws to ask for an investment;[16]

- McKnight lived close to Daws as a child and once worked for her husband; and

- McKnight was a pallbearer at Daws's funeral upon request by a funeral director, and he attended her burial service.

---

[15]The assistance for the oil and gas matters occurred in the 1990s. In a deposition that Lindley submitted, McKnight said that he helped Daws to "make sure that the oil companies . . . were fair." He explained that he would "help nearly anyone that asked for the help and never charge a fee."

[16]Arms-length transactions entered for parties' mutual benefit do not establish a basis for imposing a fiduciary relationship. *Meyer*, 167 S.W.3d at 331.

22

These facts are common to ordinary friendly and neighborly relationships; they do not demonstrate a special relationship of trust and confidence. We conclude, therefore, that the facts do not amount to any material evidence that would justify the imposition of an extraordinary fiduciary relationship. *See Meyer*, 167 S.W.3d at 330–31; *Rice*, 324 S.W.3d at 679; *Cotten*, 187 S.W.3d at 698. Thus, we hold that the trial court did not err by granting summary judgment against Lindley's breach of fiduciary duty claim, and we overrule that portion of her third issue.

**Common law and statutory fraud**

Next, Lindley contends that the trial court erred by granting summary judgment against her fraud and statutory fraud claims. Lindley pled that appellees committed fraud and statutory fraud because McKnight knowingly misrepresented the necessity and legal effect of the shareholders' agreements with the intent to obtain Daws's signatures on them. A party commits fraud by (1) making a false, material misrepresentation (2) that the party either knows to be false or asserts recklessly without knowledge of its truth (3) with the intent that the misrepresentation be acted upon, (4) and the person to whom the misrepresentation is made acts in reliance upon it (5) and is injured as a result. *All Am. Tel., Inc.*, 291 S.W.3d at 527 (citing *W.L. Lindemann Operating Co. v. Strange*, 256 S.W.3d 766, 776 (Tex. App.—Fort Worth 2008, pet. denied)). "The elements of statutory fraud . . . are essentially identical to the elements of common law fraud except that [section 27.01 of the business and commerce code] does not require proof of knowledge or recklessness as a prerequisite to

23

the recovery of actual damages." *Brush v. Reata Oil & Gas Corp.*, 984 S.W.2d 720, 726 (Tex. App.—Waco 1998, pet. denied); *see* Tex. Bus. & Com. Code Ann. § 27.01 (West 2009); *Jones*, 2010 WL 3157145, at *8.[17]

Appellees asserted in the trial court that Lindley had no evidence of a material misrepresentation, Daws's reliance on a misrepresentation, or Daws's injury as the result of a misrepresentation. In response, Lindley first contended that she did not have a burden to produce evidence of a misrepresentation because of McKnight's alleged fiduciary relationship with Daws (which we have concluded that Lindley failed to raise a material fact issue on).[18] She then produced evidence that she claimed proved that (1) "[t]here was a material misrepresentation made by [appellees] to [Daws]"; (2) "[t]he material representation was false"; (3) "the knowledge of falsity and intent by [appellees] that [Daws] act on the misrepresentations may be inferred from other evidence"; and (4) "Daws and her estate were injured by the misrepresentations." Appellees reiterated in their reply to Lindley's response that Lindley had not produced competent evidence of reliance.

---

[17]In a statutory fraud case, the plaintiff may receive exemplary damages if it proves the defendant's actual awareness of the falsity of a representation. Tex. Bus. & Com. Code Ann. § 27.01(c).

[18]"Texas courts have applied a presumption of unfairness to transactions between a fiduciary and a party to whom he owes a duty of disclosure, thus casting on the fiduciary the burden to establish fairness." *Miller v. Miller*, 700 S.W.2d 941, 946 (Tex. App.—Dallas 1985, writ ref'd n.r.e.) (op. on reh'g).

24

We agree that the competent evidence fails to raise a genuine factual issue on reliance. Lindley argues that the alleged misrepresentation about the necessity of the shareholders' agreements occurred when McKnight sent his November 1996 letter to Olney's shareholders. The letter stated in part,

> In order to elect subchapter S treatment, all shareholders and their spouses must agree in writing to the election, *and for this purpose* we have enclosed . . . *a Shareholders' Agreement which must be signed by all shareholders and their spouses*. The Shareholders' Agreement is designed to protect the election by restricting transfer of stock to a shareholder who is not qualified to be an S Corporation shareholder under the Internal Revenue Code. The Board of Directors urges all shareholders and their spouses to review carefully and execute the . . . Shareholders' Agreement. . . .
>
> The Board of Directors strongly recommends the S corporation election as being in the best interests of the Corporation and its shareholders. [Emphasis added.]

The italicized part of this letter might establish a genuine factual dispute about whether McKnight misrepresented that the shareholders' agreements were required to achieve the corporations' conversions to Subchapter S entities because the corporations' attorney, Craig, said that the agreements were recommended but not necessary. But Lindley did not provide evidence showing that Daws relied on the letter's statement about the necessity of the shareholders' agreements when she signed either of the agreements. Lindley did not show that the statement induced Daws to sign the agreements and that Daws would not have signed them if the letter would have instead stated, for example, that the agreements were not required to elect Subchapter S status but that, as explained by Craig, they were only recommended. Also, McKnight said

25

in his deposition (which Lindley attached to her response) that he told Daws, whose percentage of stock owned increased because of a reverse stock split associated with the conversions, that the corporations would be allowed to restrict stock ownership "based on what was best" for the corporations.[19]

In her affidavit, Lindley stated,

> I know that when [McKnight] told [Daws] that she needed to sign the shareholders agreement with all of the terms that they contained in order for the corporations to be able to elect Subchapter S Corporation status that she relied on his word that all of the terms of those agreements [were] necessary in order for Subchapter S Corporation status to be elected.

Appellees objected to this statement on the grounds that it is conclusory and does not include predicate or foundation. The trial court sustained appellees' objection. For reasons similar to those stated above, we hold that the trial court did not abuse its discretion by sustaining the objection and excluding

---

[19]McKnight testified in his deposition that he discussed the Olney shareholders' agreement with Daws in person after she received the letter. During the conversation, McKnight told Daws that she could not transfer shares to a church, and McKnight also talked to Daws about another shareholder who was upset about the reverse stock split. McKnight could not recall any other specific subjects of the conversation. As appellees argue, there is no evidence that McKnight even knew of Daws's desire to leave shares to Lindley at the time he sent the letter to Daws or talked to her about the Olney shareholders' agreement, so there is also no evidence that the purpose of the letter or conversation was to override the intentions she expressed in her will. Furthermore, contrary to Lindley's argument, the letter to Olney's shareholders (as quoted above) does not represent that the boards of directors would "*only* refuse to permit the shareholders to transfer their bank stock to persons . . . who were not permitted by federal law to be subchapter S corporation shareholders." [Emphasis added.] The express terms of the shareholders' agreement, which was enclosed with the letter, provided otherwise, and the letter told the shareholders to carefully review the agreement.

26

the statement. *See Reynolds*, 188 S.W.3d at 259. The trial court could have reasonably determined that the statement is conclusory because it does not disclose underlying facts that support Lindley's supposed knowledge that Daws relied on McKnight's statement in his letter.[20] *See McIntyre*, 109 S.W.3d at 749; *Ryland Group, Inc.*, 924 S.W.2d at 122.

Without the statement expressly related to reliance from Lindley's affidavit, the remaining evidence produced in response to appellees' no-evidence motion does not raise a genuine factual dispute about whether Daws relied on McKnight's statements when she signed the shareholders' agreements, even if those statements were false. Therefore, we hold that the trial court did not err by granting appellees' no-evidence motion on Lindley's fraud and statutory fraud claims, and we overrule that part of Lindley's third issue. *See* Tex. R. Civ. P. 166a(i); *Hamilton*, 249 S.W.3d at 426; *see also* Tex. Bus. & Com. Code Ann. § 27.01(a)(1)(B); *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010) (reiterating that fraud requires "that the plaintiff show actual and justifiable reliance").

### Appellees' Affirmative Defense of Acceptance of Benefits

Because we have held that the trial court did not err by granting appellees' no-evidence motion for summary judgment with respect to Lindley's breach of fiduciary duty, fraud, and statutory fraud claims, we now consider whether the

---

[20]We therefore overrule the part of Lindley's fourth issue that challenges the exclusion of this statement from Lindley's affidavit.

27

trial court correctly concluded that an affirmative defense raised as part of appellees' traditional motion for summary judgment precludes Lindley's breach of contract and UDJA claims. As part of her second issue, Lindley contends that the trial court erred by granting summary judgment to appellees on the basis of their acceptance of benefits defense.

In appellees' September 2006 supplemental answer to Lindley's second amended original petition, they pled that Lindley's claims were barred by the acceptance of benefits defense. Appellees raised only accord and satisfaction and judicial estoppel in their January 2006 "First Traditional Motion for Partial Summary Judgment." However, appellees sought summary judgment on their acceptance of benefits defense in an October 2006 supplement to their traditional motion for summary judgment. In January 2008, with leave of court, appellees again argued, in another supplement, that Lindley was estopped from bringing her claims because of acceptance of benefits. Lindley's response to appellees' January 2008 supplement recognized that appellees had raised an estoppel defense based on acceptance of benefits. In March 2009, appellees filed a motion that asked the trial court to rule on the estoppel defense. The trial court signed a final judgment in April 2009 that granted summary judgment for appellees based on their traditional motion for summary judgment and "additional materials submitted and before the court." Lindley's briefing presents substantive arguments related to appellees' acceptance of benefits defense; Lindley does not expressly argue that the defense was not properly before the trial court or is not

28

subject to our consideration. We will therefore consider the acceptance of benefits defense. *See Nguyen v. Woodley*, 273 S.W.3d 891, 899 & n.6 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (holding that a trial court correctly granted summary judgment on a ground contained in a supplement that was filed with leave of court); *Mowbray v. Avery*, 76 S.W.3d 663, 687–88 (Tex. App.— Corpus Christi 2002, pet. denied) (overruling an appellant's issue concerning the trial court's consideration of a supplemental motion for summary judgment).

As Lindley has recognized, "acceptance of benefits" is a species of quasi-estoppel. *Lopez v. Muñoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000); *Duncan Land & Exploration, Inc. v. Littlepage*, 984 S.W.2d 318, 330 (Tex. App.—Fort Worth 1998, pet. denied). Quasi-estoppel is an affirmative defense that precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken. *Clark v. Cotten Schmidt, L.L.P.*, 327 S.W.3d 765, 770 (Tex. App.—Fort Worth 2010, no pet.). The defense applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced or from which he accepted a benefit. *Id.*; *Lopez*, 22 S.W.3d at 864. Thus, quasi-estoppel forbids a party from accepting the benefits of a transaction and then subsequently taking an inconsistent position to avoid corresponding obligations or effects. *Clark*, 327 S.W.3d at 770.

For example, in *Doe v. Tex. Ass'n of Sch. Bds., Inc.*, we held that quasi-estoppel precluded a mother who obtained money under a settlement agreement

29

from contending that she did not have the authority to provide the consideration required to secure the money. 283 S.W.3d 451, 464 (Tex. App.—Fort Worth 2009, pet. denied) (citing *Brooks v. Brooks*, 257 S.W.3d 418, 423 (Tex. App.—Fort Worth 2008, pet. denied)). Similarly, in *Eckland Consultants, Inc. v. Ryder, Stilwell Inc.*, the Houston (First District) Court of Appeals held that quasi-estoppel prevented a property inspection company from claiming that a plaintiff did not have standing to sue for a breach of the inspection contract when the company accepted the benefits of the contract and stated in a report that noncontracting entities could rely on the inspection report. 176 S.W.3d 80, 81–83, 87–88 (Tex. App.—Houston [1st Dist.] 2004, no pet.); *see also Mulvey v. Mobil Producing Tex. & N.M. Inc.*, 147 S.W.3d 594, 608 (Tex. App.—Corpus Christi 2004, pet. denied) (holding that quasi-estoppel barred a party from challenging an agreement that it accepted benefits under); *Twelve Oaks Tower I, Ltd. v. Premier Allergy, Inc.*, 938 S.W.2d 102, 111 (Tex. App.—Houston [14th Dist.] 1996, no writ) (same).

Lindley's UDJA and breach of contract claims challenge either the validity of the shareholders' agreements or the actions that the corporations took under the agreements. But Daws's estate accepted benefits that it could not have received if the agreements are not valid and were not complied with. On October 11, 2000, the corporations sent letters to Lindley to explain that under provisions of the shareholders' agreements that were detailed in the letters, they had rejected Daws's stock transfer to her and had redeemed Daws's shares.

30

The corporations informed Lindley that they were paying her $358.03 per share for Daws's 625 shares of Olney stock and $5,543.89 per share for Daws's ninety-two shares of Throckmorton stock that the corporations redeemed. Both letters stated, "At the request of the Estate's counsel, . . . we have delayed in remitting to the Estate proceeds of the [stock] sale. However, we do not believe we should continue to delay in making payment." The record contains copies of checks (of $510,037.88 for the Throckmorton shares and $223,768.75 for the Olney shares) sent by the corporations to Daws's estate and negotiated by Lindley.

During oral argument, Lindley's counsel conceded, "The banks perfectly complied with their obligations under the shareholders' agreements when they tendered these checks." It is undisputed that Lindley knew (by way of the letters) that the corporations had disapproved of the transfers to her when she negotiated the checks and that the checks were being issued for the redemption of the shares. The *only reason* that Daws's estate could have been entitled to receive specific payments totaling $733,806.63 is the redemption of the stock under section five of the shareholders' agreements. When Lindley negotiated the checks, she obviously knew of her claims that Key had read Daws's will and that the corporations had therefore allegedly received notice of Daws's intended transfer to her because Key allegedly read Daws's will months before the checks were negotiated. Throughout the course of this litigation, which began in 2000, Lindley never returned the money that the corporations tendered to Daws's estate. We conclude that it would be unconscionable to allow Daws's estate to

31

retain the benefit it received for the redemption of Daws's shares while it concurrently challenges the provisions of the shareholders' agreements that made the redemption possible.[21] *See Clark*, 327 S.W.3d at 770.

Citing *Lopez*, Lindley argues that the "Estate's initial acceptance of lesser payments in October 2000 . . . is not inconsistent with the Estate's subsequent assertion that it was entitled to more." *See* 22 S.W.3d at 864. In *Lopez*, a contingent fee contract allowed a law firm to collect 45% of the recovery if the case was appealed to a higher court rather than 40% if it was not. *Id.* at 859. The law firm charged the Lopezes the additional 5% when the defendant initiated the appeal even though the case was settled shortly afterward. *Id.* Three years after the Lopezes received a distribution for 55% of the settlement, it sued the firm, and the firm asserted that "acceptance of benefits" precluded the Lopezes' fraud, negligence, and deceptive trade practices claims. *Id.* at 860, 863. In that context, the supreme court held that "the Lopezes' initial acceptance of a lesser portion of the settlement is not inconsistent with their later assertion that they were entitled to more." *Id.* at 864. Thus, the supreme court concluded that by accepting 55% of the settlement, which the Lopezes were undisputedly entitled

---

[21]Daws's estate, through Lindley, also acquiesced to the redemption of the shares through the shareholders' agreements in another way. After the estate received a notice of an estate tax deficiency from the Internal Revenue Service (IRS) in September 2004, the estate alleged that the IRS had overvalued Daws's interest in the corporations' shares and asserted that the correct fair market value matched the book value that the estate had received from the corporations in October 2000.

to under any scenario, they were not precluded from contending that they were entitled to 5% more under the same provision of the contingent fee contract. *See id.*

Here, however, Daws's estate could not be entitled to *any* money under section five of the shareholders' agreement unless her shares were properly redeemed. And the shares could not have been properly redeemed if there is merit to either of Lindley's breach of contract or UDJA claims, which asked the trial court to either invalidate the transfer restrictions in the shareholders' agreements or find that the corporations violated them. Thus, unlike in *Lopez*, Lindley's claim to be entitled to more money in this case is not based on the same part of the contract to which Daws's estate already received money; the claim is instead premised on challenging the very mechanism from which the $733,806.63 was paid.

We recognize that there can be no estoppel from acceptance of benefits by a person who did not have knowledge of all material facts. *Frazier v. Wynn*, 472 S.W.2d 750, 753 (Tex. 1971); *Clark*, 327 S.W.3d at 770. Lindley contends that she did not learn about the "misrepresentations regarding the consent transfer restrictions until the bank boards of directors refused to consent to the transfer of [Daws's] stock." But Daws's estate was the real plaintiff in the trial court, not Lindley.[22] The summary judgment evidence shows that Daws knew of

---

[22]As noted above, Lindley filed the lawsuit as Daws's estate's independent executor.

33

the transfer restrictions before her death. During McKnight's deposition, he said that before the corporations received Subchapter S status, he talked to Daws for about half an hour about the possible conversions, told her that there would be limitations on who could own stock once the conversions occurred, and informed her that the boards of directors would have the authority to disapprove "any transfer of stock." Furthermore, according to McKnight's affidavit, the restrictions imposed by the shareholders' agreements were "conspicuously noted on all of the share certificates of Olney and Throckmorton, including those issued to Nan Daws." Finally, and most obviously, Daws signed the shareholders' agreements that contained the restrictions. We must generally charge a party with knowledge of the contents of a document that the party signed. *See EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87, 90 (Tex. 1996).

More importantly, even if there was some point in the past when Daws did not know of the transfer restrictions and the corporations' potential to refuse her intended devise of shares to Lindley, Daws's estate, through Lindley, accepted the benefit in question ($733,806.63) at a time that it knew all facts regarding the distribution of that benefit and the actual rejection of the transfer, as is evidenced by the corporations' letters sent to Lindley in August and October 2000. *Cf. Frazier*, 472 S.W.2d at 753 (holding that quasi-estoppel did not apply because the appellant, who had orally leased land annually, did not have knowledge of a three-year lease that was executed by her children at the time that she accepted $1,225 in rent).

For all of these reasons, we hold that the trial court did not err by granting appellees' traditional motion for summary judgment against Lindley's UDJA and breach of contract claims because appellees established their acceptance of benefits (quasi-estoppel) defense as a matter of law. *See Mann Frankfort*, 289 S.W.3d at 848; *Clark*, 327 S.W.3d at 770. We overrule Lindley's second issue to that extent.[23]

**The Trial Court's Award of Attorney's Fees**

In her fifth issue, Lindley argues that the trial court erred by awarding attorney's fees to appellees. In the trial court, appellees filed an affidavit of D. D'lyn Davison, who was appellees' attorney at the time of the trial court's summary judgment decision. The affidavit recited Davison's specialization in civil trial law and detailed the work performed by her and appellees' previous counsel in this litigation. Davison expressed her familiarity with customary fees awarded by attorneys practicing in Wichita County, stated that the services rendered by appellees' counsel were necessary to properly represent appellees, and averred that appellees incurred reasonable attorney's fees of over $200,000.

---

[23]Our analysis to this point resolves the trial court's decision to grant summary judgment against all of Lindley's claims. Lindley raises other arguments in her first through fourth issues that are not necessary to the disposition of the claims as set forth herein, so we will not address those arguments, and we overrule the remainder of Lindley's first through fourth issues as moot. *See* Tex. R. App. P. 47.1; *Hawkins v. Walker*, 233 S.W.3d 380, 395 n.47 (Tex. App.—Fort Worth 2007, pet. denied).

Lindley responded by asserting, among other arguments, that appellees had failed to segregate the fees that were incurred in connection with the UDJA claim from fees incurred in defending other causes of action. The trial court found that Lindley's claims were "intertwined to the point of being inseparable" and therefore awarded appellees the "entire amount of attorney[']s fees" they had sought, which was $201,356.76.[24]

At the outset, because we have held that the trial court properly granted summary judgment against Lindley's UDJA claim, we hold that the trial court did not abuse its discretion by determining that appellees are generally entitled to reasonable and necessary attorney's fees based on that claim.[25] *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009; *Bocquet v. Herring*, 972 S.W.2d 19, 20–21 (Tex. 1998); *Comm'rs Court of Titus County v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997); *NP Anderson Cotton Exch., L.P. v. Potter*, 230 S.W.3d 457, 466 (Tex. App.—Fort Worth 2007, no pet.) (explaining that the "equity and justice of the fee award are left to the trial court's discretion").

The majority of Lindley's complaint about the trial court's award of attorney's fees concerns the court's alleged failure to properly segregate the fees that the court awarded as to claims that permit the fees from those that do not.

[24]The trial court also conditionally awarded attorney's fees related to Lindley's appeal of the trial court's summary judgment decision.

[25]Apart from the specific contentions discussed below, Lindley does not raise challenges on appeal to the general sufficiency of the evidence to prove that appellees' attorney's fees are reasonable and necessary.

A party may recover attorney's fees only if provided for by statute or by contract. *Gulf States Utilis. Co. v. Low*, 79 S.W.3d 561, 567 (Tex. 2002). "Parties seeking attorney's fees under Texas law 'have always been required to segregate fees between claims for which they are recoverable and claims for which they are not.'" *AMX Enters., L.L.P. v. Master Realty Corp.*, 283 S.W.3d 506, 521 (Tex. App.—Fort Worth 2009, no pet.) (quoting *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006)); *Potter*, 230 S.W.3d at 466. As the supreme court explained,

> [I]f any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees. Intertwined facts do not make tort fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated. . . .
>
>     . . . .
>
>     . . . [W]hen . . . it cannot be denied that at least some of the attorney's fees are attributable only to claims for which fees are not recoverable, segregation of fees ought to be required and the jury ought to decide the rest.

*Chapa*, 212 S.W.3d at 313–14; *see Potter*, 230 S.W.3d at 466 ("An exception to the duty to segregate arises when the party's claims are so interrelated that their prosecution or defense entails proof or denial of essentially the same facts."). Thus, a trial court is not required to segregate its attorney's fee award when counsel's work performs "double service" to recoverable and unrecoverable claims. *Chapa*, 212 S.W.3d at 313.

37

Lindley asserts that appellees would not normally be entitled to an attorney's fee award for defending any of the claims she brought other than her UDJA claim. Appellees do not dispute the general correctness of this assertion.[26] Rather, they contend, in part, that Lindley's pleading conflated her causes of action to the extent that work performed by appellees' attorneys to defeat Lindley's breach of contract, breach of fiduciary duty, and fraud claims concomitantly defeated her UDJA claims. We agree.

Lindley's second amended petition, which was her live pleading during the summary judgment proceedings, based Lindley's fraud, statutory fraud, and breach of fiduciary duty claims on three alleged "Misrepresentations": (1) McKnight's telling Daws that she needed to sign the shareholders' agreements for the corporations' conversions to Subchapter S status; (2) McKnight's failure to disclose that the corporations could have made the conversions without the execution of the shareholders' agreements; and (3) McKnight's failure to disclose that the terms of the shareholders' agreements could prevent Daws from performing her estate plan to transfer shares to Lindley. The petition based Lindley's breach of contract action on appellees' alleged failure to timely notify her of the rejection of the transfer of Daws's stock under

---

[26]We note that an award of attorney's fees is generally inappropriate for defending claims for breach of contract, breach of fiduciary, and fraud. *See MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 667 (Tex. 2009); *W. Reserve Life Assurance Co. of Ohio v. Graben*, 233 S.W.3d 360, 377 (Tex. App.—Fort Worth 2007, no pet.); *Cytogenix, Inc. v. Waldroff*, 213 S.W.3d 479, 490–91 (Tex. App.—Houston [1st Dist.] 2006, pet. denied).

the shareholders' agreements.  With regard to Lindley's UDJA claim, the petition stated,

> In the further alternative, [Lindley] is a person interested under the shareholders['] agreements and whose rights . . . are affected by same, and is therefore entitled to obtain a declaration from this Court of such rights . . . pursuant to . . . the Texas Civil Practice & Remedies Code. . . .  Plaintiff requests the Court to declare that the shareholders['] agreements, or various provisions thereof, are void because they were procured by fraud . . . , or because they contain provisions which are unreasonable restraints on alienation of [Daws's] stock which are invalid under Texas law.  Plaintiff further requests the Court to declare that the Defendants, in any event, failed to comply with the shareholders['] agreements in seeking to exercise their purported rights to redeem [Daws's] common stock for only the book value price.

Thus, Lindley's petition shows that she predicated her UDJA claim on the factual and legal theories that she offered in support of each of her other claims.[27]  In a similar case in which a hospital's defense of a UDJA claim depended on the same legal theory of its suit to recover on a lien, we held that the "resulting legal fees were so intertwined that they need not be segregated." *Speegle v. Harris Methodist Health Sys.*, 303 S.W.3d 32, 40 (Tex. App.—Fort Worth 2009, pet. denied) (op. on reh'g).  Because appellees' attorneys' legal services that responded to each of Lindley's claims also necessarily served to defend Lindley's theory of recovery on her UDJA claim, for which an award of attorney's fees is authorized by statute, we conclude that the trial court was not

---

[27]Also, appellees' acceptance of benefits defense, which we have held precludes Lindley's UDJA and breach of contract claims, provided "double service."  *See Chapa*, 212 S.W.3d at 313.

required to segregate its award of attorney's fees. *See Chapa*, 212 S.W.3d at 313–14; *Cooper v. Cochran*, 288 S.W.3d 522, 537 (Tex. App.—Dallas 2009, no pet.) ("When the legal services provided advance both a claim for which attorney's fees are recoverable and a claim for which they are not recoverable, the claims are so intertwined that they need not be segregated."); *cf. A & L Eng'g & Consulting, Inc. v. Shiloh Apollo Plaza, Inc.*, 315 S.W.3d 928, 931 (Tex. App.—Dallas 2010, no pet.) (holding that a trial court was required to segregate its award of attorney's fees related to a UDJA claim from fees related to defending a counterclaim because defending the counterclaim "did nothing to advance" the UDJA action).

Lindley also argues that appellees are not entitled to attorney's fees for services related to their unsuccessful motions to transfer venue. Through motions filed in 2001, appellees asked the trial court to transfer venue to Throckmorton County. The trial court overruled the motions in 2003. Lindley argues that a "substantial portion" of the trial court's attorney's fee award relates to these motions and that there is no basis to allow fees in connection with prosecuting motions to transfer venue.[28] But the motions to transfer venue, if granted, certainly would have affected appellees' defense of Lindley's UDJA claim along with the remainder of her suit.

---

[28]In a document attached to Davison's affidavit, she asserted that only $3,749.69 of appellees' total fee was incurred because of services related to the motions to transfer venue.

40

Moreover, Lindley does not cite authority that establishes that a trial court must segregate specific services rendered by an attorney that were successful for the attorney's client from services that were unsuccessful when awarding attorney's fees to a party that prevailed in the overall litigation of a UDJA claim. Such a rule would be incongruous with authority stating that in a UDJA action, "the trial court may award attorney's fees to the prevailing party, may decline to award attorney's fees to either party, *or may award attorney's fees to the nonprevailing party*, regardless of which party sought declaratory judgment." *Brookshire Katy Drainage Dist. v. Lily Gardens, LLC*, 333 S.W.3d 301, 313 (Tex. App.—Houston [1st Dist.] 2010, pet. filed) (emphasis added); *see Indus. Commc'ns, Inc. v. Ward County Appraisal Dist.*, 296 S.W.3d 707, 723 (Tex. App.—El Paso 2009, pet. denied) ("The granting or denial of attorney's fees in a declaratory judgment action . . . is not dependent on a finding that a party substantially prevailed.").[29]

Here, appellees are the prevailing parties on Lindley's UDJA claim. Lindley contends that it is inequitable to require her to pay attorney's fees related to appellees' motions to transfer venue that she defeated. But the trial court could have reasonably determined that Lindley would not have been required to defend those motions apart from bringing her lawsuit, which the trial court

_____

[29]We note that federal courts, while attempting to apply Texas law, have stated that a party may recover for time spent on unsuccessful motions as long as it succeeds in the overall claim. *See, e.g.*, *DP Solutions, Inc. v. Rollins, Inc.*, 353 F.3d 421, 434 (5th Cir. 2003).

41

ultimately found to be unmeritorious. We conclude that the trial court acted within its sound discretion by awarding attorney's fees to appellees for a service by their attorney that was incidental to their defense of Lindley's UDJA claim even if the service did not directly affect the ultimate resolution of the claim.[30] *See Potter*, 230 S.W.3d at 466; *see also Templeton v. Dreiss*, 961 S.W.2d 645, 671 (Tex. App.—San Antonio 1998, pet. denied) (upholding an award of attorney's fees in a UDJA case that was based in part on time spent on defending a motion for sanctions).

For all of these reasons, we overrule Lindley's fifth issue.

## Conclusion

Having overruled all of Lindley's issues, we affirm the trial court's judgment.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; MCCOY and MEIER, JJ.

DELIVERED:  July 7, 2011

---

[30]We note that Lindley does not assert that appellees' motions to transfer venue were frivolous or brought in bad faith.