

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00047-CV

JIM CHAMBERS, MARY ANN
CHAMBERS, AND MARK
WEISBART, CHAPTER 7 TRUSTEE

APPELLANTS

V.

FIRST UNITED BANK & TRUST
COMPANY

APPELLEE

----------

FROM THE 158TH DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

In six points, Appellants Jim Chambers, Mary Ann Chambers, and Mark Weisbart, a Chapter 7 Trustee, appeal the trial court's judgment. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Factual and Procedural Background

The Chamberses owned a business called G.R.A.V.I.T.Y. Enterprises, Incorporated, all of the shares of which were held by the M & J Trust. Mr. Chambers's father created the M & J Trust for the benefit of his grandchildren, and Vaughn Andrus served as the trustee. The M & J Trust had an account with the Farmers and Merchants State Bank (FMSB) and incurred about $200,000 in overdrafts, which Andrus, Chief Executive Officer of FMSB, approved as unsecured lines of credit. In addition to these lines of credit, FMSB extended loans totaling hundreds of thousands of dollars to another of the Chamberses' businesses, to the Chamberses for a down payment on a vehicle, and to the Chamberses' family members.

### A. Home Equity Loans

In August 1999, the Chamberses obtained a home equity loan from FMSB in the principal amount of $264,600, payable in monthly installments of $2,351.23, and pledged their homestead as security for the loan. However, the Chamberses' payments were sporadic, and the Chamberses often went several months without making a payment. In November 2000, the Chamberses and FMSB agreed to a modification, renewal, and extension of the 1999 home equity loan that resulted in a loan in the principal amount of $266,428.47, payable in monthly installments of $2,502.18.

By March 2004, the Chamberses' payments were still sporadic, but FMSB did not foreclose. Instead, the Chamberses obtained another home equity loan

from FMSB in the principal amount of $440,000, payable in monthly installments of $3,228.56. The 2004 HUD settlement statement indicated that FMSB used $223,112.57 of the proceeds from this home equity loan to pay off the 1999 home equity loan.

The 2004 home equity loan included the following notice of default provision:

> If I am in default the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

First United Bank and Trust Company (the Bank) became the owner of FMSB and sent the Chamberses notice of default letters. One such letter, dated April 26, 2005, notified the Chamberses that they were in default for April's monthly payment and that if they did not cure the default on or before May 26, 2005, the Bank would accelerate and mature the note and perfect a legal foreclosure. The Bank received this payment on May 27, 2005.

**B. Legal Action**

In August 2005, the Bank filed an application in state district court seeking a court order allowing it to foreclose the lien created by the 2004 home equity loan. The application provided that the Bank had sent the requisite notices such that it was entitled to sell the property under section 51.002 of the property code. The Bank's president verified this application, averring that he had personal

knowledge of the Bank's efforts to collect the home equity loan and that the facts set forth in the application were true and correct.

In December 2005, the Chamberses filed suit in another district court seeking a declaratory judgment that the Bank's lien against the homestead was invalid and claiming that they were entitled to attorney's fees under the Uniform Declaratory Judgments Act. However, before trial began, the Chamberses filed for bankruptcy and removed the case to a bankruptcy court. The bankruptcy court held an adversary trial and determined that the Bank's home equity lien on the Chamberses' homestead was constitutionally valid. In doing so, it found that the Chamberses "received extremely favorable and personalized treatment" from the Bank and enjoyed a level of accommodation that most customers do not receive from their banks before the Bank "apparently rediscovered prudent banking practices" and that the Chamberses were "seeking a free house." The bankruptcy court remanded the remainder of the claims to the trial court. During the trial, the trial court admitted into evidence the Bank's application for an order of foreclosure and the notice of default letters.

At the conclusion of the Chamberses' case, the trial court directed a verdict in favor of the Bank on its "claim seeking a judicial foreclosure and/or final judgment that includes an order allowing foreclosure of its lien under its security instrument and Tex. Prop. Code § 51.002" and ordered that the Bank could proceed with foreclosure. The trial court directed a verdict in the Bank's favor on

4

several other of the Chamberses' claims, including breach of fiduciary duty, with the remainder of the case being submitted to the jury.

## C. Jury Questions and the Judgment

In response to the first question in the trial court's charge to the jury, the jury found that the Bank had failed to properly apply all of the Chamberses' payments on the 1999 loan. In response to the second question, the jury found that the correct payoff amount for the 1999 loan was $170,795.97.

As to the third question, which regarded damages, the Chamberses had requested that this question instruct the jury to consider the difference between the payoff for the 1999 loan received by the Bank and the correct payoff amount that the jury had found in response to the second question. However, the trial court rejected this, and the question simply asked the jury to determine what sum of money, if any, would compensate the Chamberses for the damages caused by the Bank's failure to properly credit the Chamberses with all payments on the 1999 loan. In response, the jury found that the Chamberses suffered no compensable damage as a result of the Bank's failure to properly apply the payments.

The fourth question asked the jury to determine the payoff amount on the Chamberses' 2004 home equity loan as of November 5, 2010. The Bank offered, and the trial court admitted, an exhibit that showed that this figure was $665,264.55, which consisted of the principal, the interest, and the late fees. The jury found that the payoff amount was indeed $665,264.55. Finally, in response

5

to questions five and six, the jury found that $100,000 was a reasonable fee for the necessary services of the Bank's attorney and of the Chamberses' attorney.

The Chamberses filed a motion to disregard jury answers and a motion for new trial, but the trial court found that the Bank was the prevailing party, rendered judgment on the verdict in its favor, and awarded the Bank $100,000 in attorney's fees. The Chamberses appealed this judgment, asked the court reporter to prepare a reporter's record that consisted only of the plaintiff's and the defendant's exhibits, and included a statement of its points on appeal with this request. In addition, the Chamberses asked the trial court to supplement the clerk's record to include the bankruptcy court's memorandum opinion and judgment.

### III. Fiduciary Duty

In their second point, the Chamberses argue that the trial court erred by granting the Bank's motion for directed verdict on their breach of fiduciary claim because Texas law recognizes informal fiduciary relationships between a bank and its customers and because there was legally sufficient evidence of such a fiduciary relationship between the Bank and the Chamberses.

#### A. Standard of Review

A directed verdict is proper only under limited circumstances: (1) when the evidence is insufficient to raise a material fact issue, or (2) when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent. *See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29

6

S.W.3d 74, 77 (Tex. 2000); *Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 919 (Tex. App.—Fort Worth 2009, pet. denied). In reviewing a directed verdict, we follow the standards for assessing legal sufficiency of the evidence. *See City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). We review the evidence in the light most favorable to the person suffering the adverse judgment, and we must credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 217 (Tex. 2011); *City of Keller*, 168 S.W.3d at 827.

## B. Law

### 1. Confidential Relationship

Fiduciary duties may arise from formal and informal relationships. *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 593–94 (Tex. 1992), *superseded by statute on other grounds as stated in Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 225–26 (Tex. 2002) (op. on reh'g); *Lindley v. McKnight*, 349 S.W.3d 113, 124 (Tex. App.—Fort Worth 2011, no pet.) (noting that Texas courts are reluctant to recognize fiduciary relationships). An informal fiduciary duty may arise from a moral, social, domestic, or purely personal relationship of trust and confidence, generally called a confidential relationship. *Crim Truck*, 823 S.W.2d at 594; *Lindley*, 349 S.W.3d at 124–25. A person is justified in placing confidence in the belief that another party will act in his best interest only where he is accustomed to being guided by

7

the judgment or advice of the other party and there exists a long association in a business relationship as well as personal friendship. *Lindley*, 349 S.W.3d at 125.

Therefore, to "impose such a relationship in a business transaction, there must be a fiduciary relationship before, and apart from, the agreement made the basis of the suit." *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 675 (Tex. 1998); *see Crim Truck*, 823 S.W.2d at 594 ("The fact that one businessman trusts another, and relies upon his promise to perform a contract, does not rise to a confidential relationship."); *Rice v. Metro. Life Ins. Co.*, 324 S.W.3d 660, 679 (Tex. App.—Fort Worth 2010, no pet.) ("The [appellants] have not directed us to any other evidence concerning their relationship with MetLife apart from the coverage at issue in this case.").

Furthermore, "mere subjective trust does not, as a matter of law, transform arm's-length dealing into a fiduciary relationship." *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997); *see Meyer v. Cathey*, 167 S.W.3d 327, 329–31 (Tex. 2005) (declining to recognize a fiduciary relationship when, among other facts, plaintiff and defendant were friends who ate lunch together every day for four years); *Muske v. Menke*, No. 01-10-00479-CV, 2011 WL 3612293, at *4 (Tex. App.—Houston [1st Dist.] Aug. 18, 2011, no pet.) (mem. op.) (holding that Appellant's expressed love and trust in Appellee, including her trust that he would repay an unsecured loan, is not enough to create an informal fiduciary relationship). Although a confidential relationship is ordinarily a

question of fact for the jury, it becomes a question of law when the issue is one of no evidence. *Crim Truck*, 823 S.W.2d at 594; *Lindley*, 349 S.W.3d at 125.

### 2. Special Relationship

Texas courts have also categorized certain relationships as "special relationships" that give rise to a tort duty of good faith and fair dealing. *Crim Truck*, 823 S.W.2d at 594. However, the Supreme Court of Texas cautioned as follows:

> Although a fiduciary duty encompasses at the very minimum a duty of good faith and fair dealing, the converse is not true. The duty of good faith and fair dealing merely requires the parties to "deal fairly" with one another and does not encompass the often more onerous burden that requires a party to place the interest of the other party before his own, often attributed to a fiduciary duty.

*Id.* When courts have found that a special relationship exists between a borrower and a lender, this finding has rested on extraneous facts and conduct such as excessive lender control over, or influence in, the borrower's business activities. *Davis v. West*, 317 S.W.3d 301, 312 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

### C. Analysis

The Chamberses argue that Andrus controlled the M & J Trust and, by extension, controlled G.R.A.V.I.T.Y. Enterprises and the Chamberses. Even though the evidence indeed shows that Andrus acted as trustee for the M & J Trust, and even if there were some evidence that his control extended to the Chamberses and their business, *see id.*, and even if such evidence would

9

support a finding of a special relationship that gives rise to a tort duty of good faith and fair dealing, the supreme court has cautioned that such a special relationship does not give rise to a fiduciary duty. *See Crim Truck*, 823 S.W.2d at 594. Therefore, evidence of this sort was insufficient to raise a material fact issue regarding the existence of a fiduciary duty between the Bank and the Chamberses. *See Prudential*, 29 S.W.3d at 77.

Instead, to create a fact issue at trial regarding the existence of an informal fiduciary duty, the Chamberses needed to offer evidence of a moral, social, domestic, or purely personal relationship of trust and confidence that existed before they obtained the 1999 loan. *See Morris*, 981 S.W.2d at 675; *Crim Truck*, 823 S.W.2d at 594. The Chamberses point to the bankruptcy court's opinion as evidence that the Chamberses received extremely favorable and personalized treatment from the Bank and enjoyed a level of accommodation that most customers do not receive from their banks. However, even viewed in the light most favorable to the Chamberses, *see Exxon Corp.*, 348 S.W.3d at 217, the manner in which the Bank treated the Chamberses as customers, however favored, is not evidence of a personal relationship apart from the business transactions that are at issue in this case. *See Crim Truck*, 823 S.W.2d at 594; *Rice*, 324 S.W.3d at 679.

The Chamberses also point to a letter that was admitted at trial in which Mr. Chambers had told Andrus that he thought they had a "very trusted friendship," that he trusted Andrus, and that he felt betrayed by Andrus.

10

However, Mr. Chambers's subjective trust does not transform his relationship with Andrus or with the Bank into a fiduciary one, much less one that existed prior to the 1999 loan that in part formed the basis of this suit. *See Morris*, 981 S.W.2d at 675; *Swanson*, 959 S.W.2d at 177; *Muske*, 2011 WL 3612293, at *4.

Without evidence sufficient to raise a material fact issue regarding an informal fiduciary duty, the trial court did not err by directing a verdict in favor of the Bank on the Chamberses' fiduciary duty claim. *See Prudential*, 29 S.W.3d at 77. Accordingly, we overrule the Chamberses' second point.

## IV. Order of Foreclosure

In their first point, the Chamberses cite the applicable rules of civil procedure that were in effect when this case was tried and claim that the trial court erred by granting the Bank's directed verdict on the Bank's rule 736 application for an order of foreclosure because (1) the Chamberses filed a contest that precluded the entry of a rule 736 order of foreclosure, (2) the Bank did not comply with rule 736's mandatory requirements, and (3) the Bank failed to comply with the notice requirements in the security instrument and in the property code. *See* Tex. Sup. Ct. R. 736, 9–10 S.W.3d (Tex. Cases) XXIV–XXIX (2000, amended 2012).

Under the applicable version of the rules of civil procedure, a party seeking to foreclose a lien created by a home equity loan may do so under rule 735 using one of three methods: (1) by filing a suit seeking judicial foreclosure, (2) by filing a suit or a counterclaim seeking a final judgment that includes an order allowing

11

foreclosure under the security instrument and section 51.002 of the property code, or (3) by filing an application under rule 736 for an order allowing foreclosure. *See* Tex. Sup. Ct. R. 735, 9–10 S.W.3d (Tex. Cases) XXIV (2000, amended 2012).

## A. Third Method—Rule 736 Application

As a threshold matter, we agree with the Chamberses that the Bank initially chose the third method and filed a rule 736 application for an order of foreclosure and that the Chamberses subsequently filed a petition contesting the Bank's right to foreclose, which abated and dismissed the rule 736 proceeding. *See* Tex. Sup. Ct. R. 736(10), 9–10 S.W.3d (Tex. Cases) XXIX (2000, amended 2012). However, contrary to the Chamberses' claim, the trial court did not somehow subsequently resurrect and grant the Bank's rule 736 application for an order of foreclosure. Instead, after the Chamberses filed their petition, the parties tried the issue of whether the Bank was entitled to an order of foreclosure, and the trial court directed a verdict in favor of the Bank and entered a judgment that included an order of foreclosure in favor of the Bank. Therefore, the Bank obtained an order of foreclosure under the second method. *See* Tex. Sup. Ct. R. 735, 9–10 S.W.3d (Tex. Cases) XXIV (2000, amended 2012). Indeed, the trial court's judgment granting the order tracked the language of the second method by noting that it had granted a directed verdict on the Bank's claim for "a final judgment that includes an order allowing foreclosure of its lien under its security instrument and Tex. Prop. Code § 51.002." *See id.*

12

The Chamberses argue that the Bank did not seek foreclosure using the second method because it did not raise a counterclaim expressly pleading relief for a judgment that included an order of foreclosure under the security instrument and section 51.002 of the property code. *See id.* While a trial court cannot enter judgment on a theory of recovery not sufficiently set forth in the pleadings, *Street v. Skipper*, 887 S.W.2d 78, 80 (Tex. App.—Fort Worth 1994, writ denied); *see* Tex. R. Civ. P. 301, a party's unpleaded issue may be deemed tried by consent when evidence on the issue is developed under circumstances indicating that both parties understood that the issue was in the case, and the other party failed to make an appropriate complaint. *In re A.B.H.*, 266 S.W.3d 596, 600 (Tex. App.—Fort Worth 2008, no pet.); *see* Tex. R. Civ. P. 67.

Here, the trial court admitted evidence on the issue of the security instrument's and section 51.002's notice requirements when it admitted the Bank's notices to cure default. *See A.B.H.*, 266 S.W.3d at 600. Furthermore, the Chamberses understood that these notice requirements were issues in the case because, as the Chamberses acknowledge in their brief, they argued in their response to the Bank's motion for directed verdict that the Bank failed to satisfy these very notice requirements. *See id.* Even if we were to agree that the trial court granted the Bank's application for an order of foreclosure under rule 736, the third method, a grant or denial of a rule 736 application is not appealable. See Tex. Sup. Ct. R. 736(8)(A), 9–10 S.W.3d (Tex. Cases) XXVIII (2000, amended 2012). Because the first two subparts of the Chamberses' first point

13

relate solely to rule 736, we overrule those portions of the Chamberses' first point.

## B. Second Method—Judgment Including Foreclosure Order

Because the portion of the Chamberses' first point regarding notice can be interpreted as a claim that the trial court erred by granting a directed verdict under the second method, we will treat it as such and address it. *See* Tex. Sup. Ct. R. 735, 9–10 S.W.3d (Tex. Cases) XXIV (2000, amended 2012). Specifically, the Chamberses claim that the foreclosure order did not properly allow foreclosure under the security agreement because the Bank failed to send notice according to the 2004 loan's notice of default provision.

The Chamberses acknowledge that the Bank sent the April 26 letter that required the Chamberses to cure the default on or before May 26 to avoid acceleration, but the Chamberses argue that this letter is not relevant or applicable because the Chamberses cured the default on May 27. The Chamberses argue that if the Bank believed that the Chamberses had not satisfied the conditions of the April 26 letter, then it would not have sent subsequent letters complaining of later defaults. The Chamberses do not cite to authority, nor do we find any authority, for the proposition that this changes the fact that the Bank strictly complied with the notice of default provision and was entitled to accelerate. *See Iden v. Lippard*, 166 S.W.2d 185, 186–87 (Tex. Civ. App.—Waco 1942, no writ) (holding that the debtor's willingness and ability to pay indebtedness after the cure date could not divest the holder of its vested

14

rights under the contract to recover the full amount of the principal). Therefore, the evidence conclusively established that the Bank gave the Chamberses the notice required by the security instrument. *See* Tex. Sup. Ct. R. 735, 9–10 S.W.3d (Tex. Cases) XXIV (2000, amended 2012); *Prudential*, 29 S.W.3d at 77.

The Chamberses also argue that the evidence was insufficient to establish that the Bank complied with the property code because the notation on the notices indicating that they were sent by certified mail is not conclusive evidence that the Bank sent the notices by certified mail. *See* Tex. Prop. Code Ann. § 51.002(d) (West Supp. 2011). The property code provides that "the affidavit of a person knowledgeable of the facts to the effect that service was completed is prima facie evidence of service." *See id.* § 51.002(e). The trial court admitted the rule 736 application that the Bank had filed before the Chamberses filed the underlying suit. This application provided that the Bank had sent the requisite notice and that the note had been properly accelerated according to section 51.002, and it was sworn to by a person with knowledge of these facts. *See id.* § 51.002(d), (e). Therefore, the application served as conclusive evidence of compliance with this section. *See id.*; *Prudential*, 29 S.W.3d at 77. Accordingly, the trial court did not err in directing a verdict in the Bank's favor, *see Prudential*, 29 S.W.3d at 77, and we overrule the Chamberses' first point.

### V. Motion to Disregard Jury Answers and Motion for New Trial

In their third and fifth points, the Chamberses claim that the trial court erred by denying their motion to disregard jury answers and by denying their motion for

15

new trial because the jury's answers to questions three and four were not supported by legally or factually sufficient evidence.

## A. Standard of Review

### 1. Legal Sufficiency

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). If a party is attacking the legal sufficiency of an adverse finding on a point on which the party had the burden of proof, and there is no evidence to support the finding, we review all the evidence to determine whether the contrary proposition is established as a matter of law. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989).

### 2. Factual Sufficiency

When reviewing the factual sufficiency of the evidence, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence,

16

that the answer should be set aside and a new trial ordered.  *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

### 3.  Partial Record Presumption

An appellant requesting a partial reporter's record must include in the request a statement of the points or issues to be presented on appeal.  Tex. R. App. P.  34.6(c)(1).  If the appellant complies with this requirement, we presume that the partial reporter's record constitutes the entire record for purposes of reviewing the appellant's points, even legal and factual sufficiency points.  Tex. R. App. P. 34.6(c)(4).   But if the appellant fails to comply, the contrary presumption arises, and we must instead presume that the missing portions of the record contain evidence that supports the trial court's judgment.  *CMM Grain Co., Inc. v. Ozgunduz*, 991 S.W.2d 437, 439 (Tex. App.—Fort Worth 1999, no pet.).

## B.  Analysis

At the outset, we note that while the reporter's record is replete with evidence—over one hundred exhibits consisting of hundreds of pages and countless numerical figures—it is only a partial record because the Chamberses did not provide us with any trial testimony at all, including that explaining this information.  Therefore, we apply the appropriate presumption when evaluating the Chamberses' legal and factual sufficiency points; that is, because the Chamberses properly requested the partial reporter's record, we presume that

17

the record designated by the parties is the entire record. *See* Tex. R. App. P. 34.6(c)(1), (4).

### 1. Question Three—Damages

In their third point, the Chamberses argue that the "math is simple" and that by virtue of the Bank having overstated the 1999 loan payoff by $52,316.60, calculated by subtracting the $170,795.97 loan payoff figure that the jury determined was correct from the $223,112.57 figure included in the 2004 HUD settlement statement, the Chamberses were entitled to that amount in damages.

The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained. *Coldwell Banker Whiteside Assocs. v. Ryan Equity Partners, Ltd.*, 181 S.W.3d 879, 891–92 (Tex. App.—Dallas 2006, no pet.). In light of our standard of review and the applicable presumption, the Chamberses cannot prevail on their claim that the evidence supporting the jury's adverse finding regarding damages, a point on which the Chamberses had the burden of proof, was legally insufficient unless the partial record conclusively establishes that the Chamberses actually sustained $52,316.60 in damages. *See* Tex. R. App. P. 34.6(c)(1), (4); *Dow Chem.*, 46 S.W.3d at 241; *Uniroyal*, 977 S.W.2d at 334; *Calce v. Dorado Exploration, Inc.*, 309 S.W.3d 719, 733–34 (Tex. App.—Dallas 2010, no pet.) (recognizing that a plaintiff claiming breach of contract has the burden to prove damages).

The jury found, and the record appears to reflect, that the Bank misapplied the 1999 loan payments. We agree that the formula that the Chamberses used

18

to conclude that the Bank overstated the 1999 loan payoff by $52,316.60 is relatively simple and indeed yields that dollar amount. However, the record does not contain evidence conclusively establishing that this is the proper formula to apply to determine the Chamberses' damages, if any. *See Dow Chem.*, 46 S.W.3d at 241; *Uniroyal*, 977 S.W.2d at 334. Indeed, the record does not conclusively establish, nor do the Chamberses argue, that the Bank altogether failed to apply the payments toward the Chamberses' numerous debts. Because the record contains evidence of hundreds of thousands of dollars of indebtedness, in addition to the home equity loan debts, we cannot conclusively determine that the Chamberses sustained damage at all by the Bank's misapplication to the single home equity loan debt, much less in the amount of $52,316.60.

In short, the Chamberses are correct that their damages formula is simple. But in light of the voluminous record that is full of inconsistent numbers and devoid of any testimony to explain their significance, this formula is indeed too simple to conclusively prove damages, if any, because it does not account for the fact that the Bank may have applied the Chamberses' sporadic and unpredictable payments toward their other debts. *See Dow Chem.*, 46 S.W.3d at 241; *Uniroyal*, 977 S.W.2d at 334. Therefore, the evidence was legally sufficient to support the jury's finding of no damages. *See Uniroyal*, 977 S.W.2d at 334.

Similarly, because we have no testimony explaining the import of any of the numbers in these exhibits, we cannot say that the evidence of no damages

was so weak or overwhelmed by the Chamberses' evidence of $52,316.60 in damages as to the single home equity loan debt. *See Pool*, 715 S.W.2d at 635. Therefore, the evidence supporting the jury's finding of no damages was also factually sufficient, *see id.*, and we overrule the Chamberses' third point.

### 2. Question Four—2004 Home Equity Loan Payoff

In their related fifth point, the Chamberses argue that because the Bank calculated the 2004 loan payoff figure using the overstated 1999 loan payoff figure, there was legally and factually insufficient evidence to support the jury's finding that the 2004 loan payoff was $665,264.55. For the same reasons that we determined that the evidence did not conclusively prove that the Chamberses sustained $52,316.60 in damages, we conclude that the evidence in the partial record does not conclusively prove that the 2004 loan payoff should have been reduced by this amount. *See Dow Chem.*, 46 S.W.3d at 241; *Uniroyal*, 977 S.W.2d at 334. Therefore, the evidence was legally sufficient to support the jury's finding that the 2004 loan payoff included this amount. *See Uniroyal*, 977 S.W.2d at 334.

Similarly, because the exhibits in the record that might amount to evidence that the 2004 loan payoff amount needed to be reduced by $52,316.60 are not explained by trial testimony, we cannot conclude that the Bank's evidence supporting the 2004 loan payoff amount of $665,264.55 was so weak or so contrary to the overwhelming weight of all the evidence. *See Pool*, 715 S.W.2d

at 635. Therefore, the evidence supporting the jury's answer to question four was also factually sufficient, *see id.*, and we overrule the Chamberses' fifth point.

## VI. Jury Instruction

In their fourth point, the Chamberses claim that the trial court erred by refusing to include their measure of damages in question three. We review a jury charge for an abuse of discretion. *Steak & Ale of Tex., Inc. v. Borneman*, 62 S.W.3d 898, 904 (Tex. App.—Fort Worth 2001, no pet.). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). If the trial court fails to include an instruction on the proper measure of damages, it is the complaining party's burden both to object to the charge and to tender a substantially correct instruction in writing. Tex. R. Civ. P. 278. When a trial court refuses to submit a requested instruction, the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict. *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex. 2000).

The Chamberses tendered a proposed written instruction, but on the partial record before us, which does not include testimony to give meaning to any of the exhibits, we cannot conclude that their proposed instruction included a substantially correct measure of damages or that it was reasonably necessary to

21

enable the jury to render a proper verdict.  *See* Tex. R. Civ. P. 278; *Mandlbauer*,

34 S.W.3d at 912.  Therefore, the trial court acted with reference to guiding

principles and did not abuse its discretion by refusing to include this instruction.

*See Low*, 221 S.W.3d at 614; *Cire*, 134 S.W.3d at 838–39.  Accordingly, we

overrule the Chamberses' fourth point.

**VII.  Costs and Attorney's Fees**

In their sixth point, the Chamberses claim that the trial court erred by

awarding costs and attorney's fees to the Bank but not to the Chamberses.

**A.  Civil Practice and Remedies Code**

First, the Chamberses argue that they were entitled to their attorney's fees

under the civil practice and remedies code because they prevailed on their

breach of contract claim.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.001 (West

2008).  However, to recover attorney's fees for a breach of contract claim, a party

must prevail at trial and recover damages.  *Id.* § 38.001(8); *Green Int'l, Inc. v.*

*Solis*, 951 S.W.2d 384, 390 (Tex. 1997).  Although the jury found that the Bank

had failed to properly apply the Chamberses' payments, the jury awarded zero

damages to the Chamberses.  Therefore, because the Chamberses failed to

recover damages on their breach of contract claim, they were not entitled to

recover attorney's fees under section 38.001.[2]  *See* Tex. Civ. Prac. & Rem. Code

Ann. § 38.001; *Green*, 951 S.W.2d at 390.

---

[2]To the extent that the Chamberses argue that they are entitled to costs and that the Bank was not, the successful party to a suit shall recover costs from

22

## B. Uniform Declaratory Judgments Act

Next, the Chamberses claim that the trial court erred by awarding attorney's fees to the Bank. Under the Uniform Declaratory Judgments Act, an award of attorney's fees is not limited to the party who is affirmatively seeking declaratory relief; a defendant who requests an award of attorney's fees in answering a declaratory judgment suit may be entitled to its fees under the act. *Cadle Co. v. Harvey*, 46 S.W.3d 282, 289 (Tex. App.—Fort Worth 2001, pet. denied); *see* Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West 2008). The Chamberses pleaded a declaratory judgment action, and both parties requested attorney's fees. Therefore, we will apply this act to the Chamberses' claim that the Bank was not entitled to its attorney's fees. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009; *Cadle*, 46 S.W.3d at 289.

The grant or denial of attorney's fees in a declaratory judgment action lies within the discretion of the trial court, and its judgment will not be reversed on appeal absent a clear showing that it abused its discretion. *NP Anderson Cotton Exch., L.P. v. Potter*, 230 S.W.3d 457, 466 (Tex. App.—Fort Worth 2007, no pet.); *see* Tex. Civ. Prac. & Rem. Code Ann. § 37.009. Under the Uniform Declaratory Judgments Act, "the court may award costs and reasonable and necessary attorney's fees as are equitable and just." Tex. Civ. Prac. & Rem.

---

his adversary. *See* Tex. R. Civ. P. 131. Because the trial court found that the Bank was the successful party, the Bank was entitled to costs, and the Chamberses were not. *See id.*

Code Ann. § 37.009; *Potter*, 230 S.W.3d at 466. The reasonable and necessary requirements are questions of fact to be determined by the factfinder, but the equitable and just requirements are questions of law for the trial court to decide. *Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 161 (Tex. 2004). Whether the trial court determines that equity and justice preclude it from awarding the full amount of fees that the jury found to be reasonable and necessary is "a matter of fairness in light of all the circumstances." *Id.* at 162.

The Chamberses argue that it was inequitable and unjust for the trial court to award the Bank its attorney's fees. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009. The circumstances to which they point with regard to fairness, *see Ridge Oil*, 148 S.W.3d at 162, are that they had to retain an attorney to overcome the Bank's stonewalling, that the jury finally vindicated them by finding that the Bank had misapplied loan payments, and that the Bank's award will be significant if it comes out of the equity in the Chamberses' homestead. We are not persuaded.

As far as vindication, the only finding in the Chamberses' favor was the jury's finding that the Bank had misapplied the 1999 loan payments—loan payments improperly made by the Chamberses. As to the other circumstances, the trial court could have determined as a matter of fairness that requiring the Chamberses to fund the Bank's defense against the Chamberses' pursuit of "a free house" after the Bank "rediscovered prudent banking practices" is not inequitable. *See id.* The only injustice would have been a decision allowing the

24

Chamberses to avoid yet another obligation owed to the Bank and, this time, one found to be reasonable and necessary by the jury. The trial court did not do this but, instead, decided according to principles of fairness and, therefore, did not act arbitrarily or without reference to guiding principles. *See Low*, 221 S.W.3d at 614; *Cire*, 134 S.W.3d at 838–39. Therefore, the trial court did not abuse its discretion, *see Potter*, 230 S.W.3d at 466, and we overrule the Chamberses' sixth point.

## VIII. Conclusion

Having overruled each of the Chamberses' points, we affirm the trial court's judgment.

PER CURIAM

PANEL: MCCOY, J. ; LIVINGSTON, C.J.; and GABRIEL, J.

DELIVERED: May 3, 2012