

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-16-00263-CV

RAINIER SOUTHLAKE DST, A                                    APPELLANTS
DELAWARE STATUTORY TRUST;
RAINIER DST SERVICES, LLC, IN
ITS CAPACITY AS SIGNATORY
TRUSTEE FOR RAINIER
SOUTHLAKE DST, A DELAWARE
STATUTORY TRUST; AND
RAINIER CAPITAL MANAGEMENT,
LP

V.

WOODBURY STRATEGIC                                          APPELLEES
PARTNERS FUND, LP AND LAGO
DEL SUR, LLC

----------

FROM THE 96TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 096-263045-12

----------

## MEMORANDUM OPINION[1]

----------

---

[1]See Tex. R. App. P. 47.4.

# I. INTRODUCTION

This is a summary-judgment appeal. Appellants Rainier Southlake DST, a Delaware statutory trust; Rainier DST Services, LLC, in its capacity as signatory trustee for Rainier Southlake DST, a Delaware statutory trust; and Rainier Capital Management, LP (collectively "Rainier") sued Appellees Woodbury Strategic Partners Fund, LP and Lago Del Sur, LLC (collectively "Woodbury"), alleging breach of fiduciary duty and breach of contract. Rainier also sought a constructive trust over certain properties and exemplary damages. Woodbury filed a combined no-evidence and traditional motion for summary judgment, and the trial court granted summary judgment for Woodbury on all of Rainier's claims without specifying the grounds for its ruling. In eight issues, Rainier challenges the trial court's summary judgment. We will affirm.

# II. FACTUAL AND PROCEDURAL BACKGROUND

In 2012, Rainier owned a building portfolio in Southlake, Texas, consisting of twenty-one buildings. To finance the purchase of that portfolio, Rainier had taken out a loan of $15,400,000 secured by a lien on the portfolio properties as evidenced by a deed of trust for the benefit of the lender. Rainier defaulted on the loan, and the lender transferred it to a special servicer, Midland Loan Services. To avoid foreclosure on the portfolio properties, Rainier began working with Quarter Circle Capital (QCC)—an investor in distressed real-estate collateralized loans—to evaluate possible financial solutions. QCC identified Woodbury as a potential investor, and Rainier, QCC, and Midland Loan Services

2

began negotiating towards a restructure of the loan. The negotiations quickly moved to discussions of a discounted payoff. Woodbury and Rainier thereafter engaged in extensive negotiations regarding Woodbury's potential purchase of the loan at a discounted price for a preferred return.

On February 15, 2012, QCC in conjunction with Woodbury submitted to Rainier a "Proposed Term Sheet" containing the terms of Woodbury's contemplated purchase of the loan; the proposed term sheet stated that the project closing date was "TBD."[2] The proposed term sheet stated:

> QCC and Rainier have negotiated a discounted payoff of the existing loan for $12,000,000 and other consideration. To execute the discounted payoff and to minimize the tax consequences to [Rainier] that would occur in foreclosure, QCC and [Rainier] mutually agree to the terms herein that will be incorporated into a single purpose entity that will govern the Partnership going forward.

The term "Partnership" was defined in the proposed term sheet as a "single purpose limited liability company."

The proposed term sheet also contained other provisions, including provisions relating to the capital to be invested, the preferred return, a profit split, a disposition fee, an asset management fee, an acquisition fee, and others. The proposed term sheet contained the following deadline for acceptance:

> If this Term Sheet dated February 15th, 2012[,] meets with your approval, please acknowledge your acceptance of its fundamental terms by your signature herein provided below, and return to [QCC]

---

[2]According to Rainier, once negotiations began, it treated QCC and Woodbury as one and the same. For purposes of this summary-judgment appeal, we do so as well.

via email or facsimile, on or before February 17th, 2012[,] at 11:59 PM (PST), or this Term Sheet will become null and void.

On March 7, 2012, Starr Schulke, the Chief Investment Officer of QCC, emailed a copy of the proposed term sheet, signed by Woodbury, to Sean Cross, Rainier's representative. That same day, Cross emailed Schulke and told him that a "clarification" needed to be added to the term sheet regarding when a disposition fee called for in the term sheet was to be paid; Cross suggested, "[L]et's discuss tomorrow[.]" Schulke responded that "[w]e can firm up the language [about the disposition fee] in the management agreement. Let's get the executed Term Sheet over to Midland." So on March 8, 2012, Cross emailed a copy of the proposed term sheet, signed by both Woodbury and Rainier, to Midland.[3]

On March 15, 2012, Schulke requested that Cross forward an executed copy of the proposed term sheet to QCC. Rather than forwarding an executed copy to QCC as Schulke had requested, Cross sent the following email to Schulke:

> We sent the signed term sheet over to Midland to keep the ball moving. There were items in it, including the property management agreement[,] that we need to get finalized before it's in final form to sign. I've attached comments / changes to the term sheet and another copy of the proposed property management agreement for review. . . . Let's discuss.

_____

[3]Cross testified that he believed that Ken Dunn, another of Rainier's representatives, signed the proposed term sheet on March 8, 2012.

4

A redline version of the proposed term sheet, making changes to the "Disposition Fee" and "Property Management" sections, was attached to Cross's email. Before Cross's changes, the "Disposition Fee" section had read as follows:

> [Woodbury] and Co-Investor agree to pay a Disposition Fee to Rainier equal to 1% of the gross sales price upon sale of the portfolio. The Disposition Fee shall be subordinate to the Preferred Return.

Cross removed the language calling for the disposition fee to be subordinate to the preferred return so that after his redline changes, the "Disposition Fee" section stated:

> [Woodbury] and Co-Investor agree to pay a Disposition Fee at closing to Rainier equal to 1% of the gross sales price of any assets, in whole or part, of the portfolio.

Prior to Cross's changes, the "Property Management" section had read as follows:

> [Woodbury] agrees to maintain the existing property management company at an annual fee of 4% of the annual income. This will be governed by a standard property management agreement between the Partnership and the property manager.

After Cross's redline changes, the "Property Management" section stated:

> [Woodbury] agrees to engage Rainier Property Management, L.P. to maintain the existing property management of the portfolio subject to a separate property management agreement.

Cross also attached to his email an eighteen-page proposed "Property Management Agreement," which called for a management fee of 5% of the monthly gross revenues of the preceding month in addition to a $500 monthly accounting fee payable to the property manager.

5

The parties continued to negotiate the terms of a property management agreement after Cross's March 15 email. On March 30, 2012, Danny Woodbury, Woodbury's representative, emailed Cross a new version of a property management agreement that included Woodbury's proposed changes. Woodbury proposed numerous changes, including deleting the $500 monthly accounting fee and changing the management fee to 4% of the monthly gross revenues of the preceding month. Despite these negotiations, the parties never finalized a property management agreement. And Rainier never provided Schulke and Woodbury with a fully executed copy of the proposed term sheet, despite Schulke's request for it and the deadline for acceptance.

Meanwhile, Rainier began negotiating a different deal with Karlin Real Estate, LLC. On April 25, 2012, a Karlin representative emailed Cross a quote that included a $9,400,000 senior secured term loan and a $3,000,000 equity contribution. On May 14, 2012, Cross emailed a Midland representative and informed him that "we are also talking with Karlin Real Estate about the Southlake transaction." Two weeks later, Cross emailed the Midland representative and forwarded a proposed term sheet between Karlin and Rainier that included a $12,000,000 senior secured term loan.[4]

Midland realized that the proposed deal between Rainier and Woodbury "was not as 'fully baked' as [Midland] had been led to believe," so Midland

---

[4]This proposed term sheet was signed by Karlin but not by Rainier.

6

decided to sell the loan to the highest bidder through a public auction. Woodbury purchased the note at the auction through its affiliate, Lago Del Sur, LLC. According to Cross, Lago Del Sur used "confidential information" that Woodbury had obtained from Rainier to help Lago Del Sur in the bidding process.

Rainier filed suit against Woodbury alleging claims for breach of fiduciary duty and breach of contract.[5] Rainier alleged that the proposed term sheet constituted a partnership agreement that imposed fiduciary partnership duties on Woodbury and that Woodbury had breached the partnership-imposed fiduciary duties and the partnership contract (the proposed term sheet). Rainier sought a constructive trust over the buildings in the portfolio and exemplary damages.

Woodbury filed a combined no-evidence and traditional motion for summary judgment. Woodbury's no-evidence motion asserted that Rainier had "no evidence that Woodbury owed or breached a fiduciary duty" and that Rainier had "no evidence that a partnership existed between [Rainier] and Woodbury." Woodbury's traditional motion asserted that no genuine issue of material fact existed as to these same two elements.[6] Woodbury argued that the proposed

---

[5]Rainier also brought a breach-of-contract claim against QCC. But the trial court later granted QCC's motion to dismiss and ordered QCC dismissed from the lawsuit.

[6]The elements of a breach-of-fiduciary-duty claim are (1) a fiduciary relationship between the plaintiff and defendant, (2) a breach by the defendant of his fiduciary duty to the plaintiff, and (3) an injury to the plaintiff or benefit to the defendant as a result of the defendant's breach. *Lindley v. McKnight*, 349 S.W.3d 113, 124 (Tex. App.—Fort Worth 2011, no pet.). When a partnership

7

term sheet was not an enforceable partnership agreement because it was not a valid contract. Woodbury pointed out that the proposed term sheet was rejected by Rainier when Cross emailed his changes—a counteroffer—to Schulke.

Rainier's summary-judgment response asserted that Woodbury owed Rainier a fiduciary duty because Woodbury and Rainier had "entered into an enforceable partnership agreement"—the proposed term sheet.

The trial court granted summary judgment for Woodbury on both of Rainier's claims. Rainier then perfected this appeal.

### III. STANDARD OF REVIEW

When a party seeks both a no-evidence and a traditional summary judgment on the nonmovant's claims—as Woodbury did here—we first review the trial court's summary judgment under the no-evidence standard of Texas Rule of Civil Procedure 166a(i). *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). Under that standard, after an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. Tex. R. Civ. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.*; *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The trial court

---

exists, the partners owe each other fiduciary duties and are liable for a breach of those duties. *M.R. Champion, Inc. v. Mizell*, 904 S.W.2d 617, 618 (Tex. 1995).

8

must grant the motion unless the nonmovant produces summary-judgment evidence that raises a genuine issue of material fact. *See* Tex. R. Civ. P. 166a(i) & cmt.; *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008).

When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006). We review a no-evidence summary judgment for evidence that would enable reasonable and fair-minded jurors to differ in their conclusions. *Hamilton*, 249 S.W.3d at 426 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)). We credit evidence favorable to the nonmovant if reasonable jurors could, and we disregard evidence contrary to the nonmovant unless reasonable jurors could not. *Timpte Indus.*, 286 S.W.3d at 310 (quoting *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006)). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied*, 541 U.S. 1030 (2004).

## IV. NO-EVIDENCE SUMMARY JUDGMENT PROPER ON BREACH-OF-FIDUCIARY-DUTY CLAIM

In its first through fourth issues, Rainier argues that the trial court erred by granting summary judgment on its breach-of-fiduciary-duty claim because more

9

than a scintilla of summary-judgment evidence exists that a partnership was formed between Rainier and Woodbury and that Woodbury breached the fiduciary duty imposed by its partnership with Rainier.

## A. Rainier's Summary-Judgment Evidence

Rainier's summary-judgment evidence of its purported enforceable partnership agreement with Woodbury consisted of the proposed term sheet; various emails relating to the proposed term sheet; excerpts from a temporary injunction hearing; the deposition excerpts of Cross, Schulke, and Woodbury; and a bid package.

In one of Cross's deposition excerpts relied upon by Rainier, Cross is asked, "Which version of the term sheet is the partnership agreement, Exhibit 1 or Exhibit 2?" The proposed term sheet marked as Exhibit 1 is the initial March 7, 2012 term sheet that Schulke emailed to Cross; the proposed term sheet marked as Exhibit 2 is a redline version of the initial term sheet reflecting changes that Cross made before he emailed it back to Schulke. In the deposition excerpt, Cross answered that the alleged partnership agreement between Rainier and Woodbury was the proposed term sheet marked as "Exhibit 1."[7]

## B. The Parties' Positions on Appeal

Although Rainier pleaded that "Woodbury and [Rainier] executed a partnership agreement in March 2012," Rainier argues that creation of a binding

_____

[7]All references to the "proposed term sheet" hereinafter are to the initial proposed term sheet in Exhibit 1 unless expressly stated otherwise.

10

contract is not required to achieve formation of a partnership. Rainier argues that the contract-formation elements—offer, acceptance in strict compliance with the offer's terms, meeting of the minds, consent to the terms, execution and delivery of the contract with the intent that it be mutually binding, and consideration—are not controlling factors in determining whether a partnership agreement exists. *See generally Advantage Physical Therapy, Inc. v. Cruse*, 165 S.W.3d 21, 24 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (setting forth elements needed to form a valid and binding contract). Instead, Rainier argues that whether a partnership agreement exists is controlled by application of the five statutory partnership-formation factors set forth in section 152.025(a) of the Texas Business Organizations Code. *See* Tex. Bus. Orgs. Code Ann. § 152.052(a) (West 2012) (setting forth five nonexclusive partnership factors). Rainier argues that applying these factors, the totality of the circumstances establishes the existence of—or at least constitutes a scintilla of evidence of the existence of—a partnership between Woodbury and Rainier. *See Ingram v. Deere*, 288 S.W.3d 886, 898 (Tex. 2009) (instructing courts to view statutory partnership factors by applying a totality-of-the-circumstances test). Specifically, Rainier claims that it proffered summary-judgment evidence—the proposed term sheet—that constituted more than a scintilla of evidence of three of these five partnership-formation factors: (1) the right to receive a share of the profits of the business; (2) an expression of an intent to be partners in the business; and (3) an agreement to contribute or contributing money or property to the business.

11

Woodbury's position is that the proposed term sheet is no evidence of any of the three partnership-formation factors relied upon by Rainier. Woodbury contends that because the proposed term sheet contained unresolved issues not negotiated to mutual agreement, it did not and could not confer to Woodbury a right to receive a share of anything, did not express any intent between the parties to be partners, and did not constitute Woodbury's agreement to contribute money until all terms were finally negotiated. Woodbury argues that contract-formation principles apply to determine whether the proposed term sheet is an enforceable partnership agreement between Rainier and Woodbury and that it is not a contract because Cross made a counteroffer.

Based on the unique facts presented here and the parties' contrary positions concerning the controlling analysis, we analyze whether—applying the appropriate standard of review as set forth above—more than a scintilla of evidence exists of a partnership agreement between Rainier and Woodbury under either contract-formation principles or section 152.052(a)'s partnership-formation factors.

## C. No Evidence Exists of Partnership

### 1. Under Contract-Formation Principles

Looking first to contract-formation principles, the elements of a valid contract are as follows: (1) an offer; (2) an acceptance; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Brown v. Sabre, Inc.*,

12

173 S.W.3d 581, 588 (Tex. App.—Fort Worth 2005, no pet.). An acceptance must be clear and definite and may not change or qualify the material terms of an offer. *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 513–14 (Tex. 2014); *Coleman v. Reich*, 417 S.W.3d 488, 491 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *see Conglomerate Gas II, L.P. v. Gibb*, No. 02-14-00119-CV, 2015 WL 6081919, at *6 (Tex. App.—Fort Worth Oct. 15, 2015, pet. denied) (mem. op. on reh'g) ("[A]n acceptance must be *identical* with the offer to make a binding contract."). A purported acceptance that changes or qualifies the material terms of an offer constitutes a rejection and counteroffer rather than an acceptance. *Amedisys*, 437 S.W.3d at 513–14; *Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 74 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). Once an offer has been terminated by the making of a counteroffer, the offeree's power to accept the original offer cannot be revived by later accepting the offer. *Davis v. Tex. Farm Bureau Ins.*, 470 S.W.3d 97, 104–05 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *see Gasmark, Ltd. v. Kimball Energy Corp.*, 868 S.W.2d 925, 929 (Tex. App.—Fort Worth 1994, no writ) ("Once terminated, an original offer can never be revived.").

An immaterial variation between the offer and acceptance, however, will not prevent the formation of an enforceable agreement. *Amedisys*, 437 S.W.3d at 514. The materiality of a contract term is determined on a contract-by-contract basis in light of the circumstances of the contract. *Id.* "A 'material term' is '[a] contractual provision dealing with a significant issue[,] such as subject matter,

13

price, payment, quantity, duration, or the work to be done.'" *Tonkin v. Amador*, No. 01-07-00496-CV, 2009 WL 1424724, at *3 (Tex. App.—Houston [1st Dist.] May 21, 2009, no pet.) (mem. op.) (quoting Black's Law Dictionary (8th ed. 2004)).

A contract does not become binding until it is executed and delivered with the intent that it be mutual and binding. *Effel v. McGarry*, 339 S.W.3d 789, 792 (Tex. App.—Dallas 2011, pet. denied); *Brown*, 173 S.W.3d at 588. To determine whether a contract is intended to be mutual and binding, courts "look[] to the communications between the parties and to the acts and circumstances surrounding these communications." *Angelou v. African Overseas Union*, 33 S.W.3d 269, 278 (Tex. App.—Houston [14th Dist.] 2000, no pet.). An acceptance must be delivered to the offeror. *Cruse*, 165 S.W.3d at 26 (citing *Jatoi v. Park Ctr., Inc.*, 616 S.W.2d 399, 400–01 (Tex. Civ. App.—Fort Worth 1981, writ ref'd n.r.e)). The timing of an acceptance is important because "[a]n offeree's power of acceptance is terminated at the time specified in the offer." *Id.*; *Valencia v. Garza*, 765 S.W.2d 893, 897 (Tex. App.—San Antonio 1989, no writ).

The proposed term sheet specifically states that Rainier was to accept it by returning it to [Woodbury] via email or facsimile on or before February 17, 2012. Otherwise, the proposed term sheet "w[ould] become null and void." Rainier did not accept and return the proposed term sheet to Woodbury on or before

14

February 17, 2012, or thereafter.[8]  Thus, Rainier's power of acceptance terminated because the proposed term sheet was not executed and delivered to Woodbury in accordance with its provisions.  *See Cruse*, 165 S.W.3d at 26 ("An offeree's power of acceptance is terminated at the time specified in the offer."); *Valencia*, 765 S.W.2d at 897 (same).

Even if Rainier could have later accepted the proposed term sheet after the February 17, 2012 deadline for acceptance, Rainier did not do so.  Instead, Rainier told Schulke on March 15, 2012, that it had sent the signed proposed term sheet to Midland "to keep the ball moving" but that "[t]here were items in it, including the property management agreement[,] that [the parties] need[ed] to get finalized before it's in final form to sign."  Rainier then made changes to the proposed term sheet, including removing language that called for the 1% disposition fee to be subordinate to the preferred return, and language—through the addition of an eighteen-page proposed "Property Management Fee"—that called for a management fee of 5% of the monthly gross revenues of the preceding month, in addition to a $500 monthly accounting fee, rather than the "annual fee of 4% of the annual income" that had been contemplated as a property management fee in the original proposed term sheet.  Rainier's changes

---

[8]It is undisputed that Rainier did not provide Schulke or Woodbury an executed copy of the proposed term sheet despite this requirement in the proposed term sheet and despite Schulke's March 15, 2012 request that it be provided to him.

15

affected the price, which is a material term of a contract.[9] *See SDN, Ltd. v. JV Rd., L.P.*, No. 03-08-00230-CV, 2010 WL 1170230, at *4–6 (Tex. App.—Austin Mar. 24, 2010, no pet.) (mem. op.); *Tonkin*, 2009 WL 1424724, at *3. Because material terms of the proposed term sheet were changed, Rainier made a counteroffer and lost its power to accept the original offer.[10] *See Amedisys*, 437 S.W.3d at 513–14; *Davis*, 470 S.W.3d at 104–05; *Parker Drilling Co.*, 316 S.W.3d at 74; *Gasmark*, 868 S.W.2d at 929.

---

[9]Rainier argues that these changes "were not material and did not vitiate formation of a partnership or a contract" because the property management agreement was "a future task of the partnership rather than a formation pre-condition." While the proposed term sheet did contemplate that the property "w[ould] be governed by a standard property management agreement," it also provided that Woodbury would "maintain the existing property management company at an annual fee of 4% of the annual income." In its proposed changes, Rainier deleted the language calling for Woodbury to "maintain the existing property management company at an annual fee of 4% of the annual income" and called for a larger 5% monthly management fee, in addition to a $500 monthly accounting fee, in the proposed property management agreement. Thus, even if entering into a property management agreement was not a formation pre-condition of the proposed term sheet, Rainier still made material changes to the proposed term sheet when it deleted the language relating to the 4% annual management fee.

[10]Rainier argues that it accepted the proposed term sheet by delivering it to Midland on March 8, 2012. But the proposed term sheet required that Rainier manifest its acceptance by sending an executed copy to QCC (Woodbury), not to Midland. Moreover, Rainier informed QCC (Woodbury) that it had sent the executed proposed term sheet to Midland "to keep the ball moving" but that there were items that needed to be changed "before it's in final form to sign." That evidence, coupled with the parties' failed negotiations and Rainier's later involvement with Karlin on a separate deal, demonstrate that when Rainier sent the executed proposed term sheet to Midland, Rainier had not accepted the contract, executed it, and delivered it with the intent that it be mutual and binding. *See Amedisys*, 437 S.W.3d at 513–14; *Conglomerate Gas II*, 2015 WL 6081919, at *6; *Brown*, 173 S.W.3d at 588.

We hold that the proposed term sheet does not constitute an enforceable contract between Rainier and Woodbury, including an enforceable written partnership agreement.

## 2. Under Section 152.052(a)'s Partnership-Formation Factors

Courts look to five non-inclusive factors to determine whether a partnership agreement exists: (1) receipt or right to receive a share of the profits of the business; (2) expression of an intent to be partners in the business; (3) participation or right to participate in the control of the business; (4) agreement to share or sharing either losses of the business or liability for claims by third parties against the business; and (5) agreement to contribute or contributing money or property to the business. Tex. Bus. Orgs. Code Ann. § 152.052(a). Courts review these factors under the totality of the circumstances. *Ingram*, 288 S.W.3d at 898.

Courts consider the evidence in support of the five partnership factors on a continuum. *Rojas v. Duarte*, 393 S.W.3d 837, 841 (Tex. App.—El Paso 2012, pet. denied). On one end of the continuum, "a partnership exists as a matter of law when conclusive evidence supports all five statutory factors," and, at the other end, "a partnership does not exist as a matter of law when there is no evidence as to any of the five factors." *Id.* (citing *Ingram*, 288 S.W.3d at 898). "Even conclusive evidence of only one factor normally will be insufficient to establish the existence of a partnership." *Ingram*, 288 S.W.3d at 898. Holding otherwise "would create a probability that some business owners would be

17

legally required to share profits with individuals or be held liable for the actions of individuals who were neither treated as nor intended to be partners." *Id.* Indeed, in creating the five factors, "[t]he [l]egislature d[id] not indicate that it intended to spring surprise or accidental partnerships on independent business persons." *Id.*

It is true that, as contended by Rainier, a partnership may be formed without the execution of a written partnership contract. *See id.* at 886 (analyzing partnership-formation factors in the absence of written agreement); *see also, e.g.*, *Nguyen v. Hoang*, 507 S.W.3d 360, 377 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (upholding jury finding of partnership despite absence of written partnership agreement); *Garcia v. Lucero*, 366 S.W.3d 275, 278 (Tex. App.—El Paso 2012, no pet.) (explaining that "the existence of a formal partnership agreement is not an element that must be proven to establish a partnership"). In a no-written-partnership-agreement case, the existence of a partnership is necessarily established by evidence of section 152.052's partnership-formation factors. *See Ingram*, 288 S.W.3d at 899–903 (setting forth checks received for "medical consultant[,]" right to receive portion of gross revenue—not profits, and other evidence that failed to establish partnership-formation factors in the absence of a written partnership agreement); *Nguyen*, 507 S.W.3d at 377–78 (setting forth testimony, bank records, sales records, tax records, and other evidence that established certain partnership-formation factors in the absence of a written partnership agreement); *Sewing v. Bowman*, 371 S.W.3d 321, 334 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd) (setting forth purported

18

partner's testimony that "the men would be 'equal partners[,]'" and other evidence that established certain partnership-formation factors in the absence of a written partnership agreement). Thus, we next examine the summary-judgment evidence presented by Rainier concerning the statutory partnership-formation factors to determine whether, considering the totality of the circumstances surrounding the factors, more than a scintilla of evidence exists that Rainier and Woodbury formed a partnership.

### a. No Right to Share Profits

Concerning the right to share in the profits of the business, Rainier points to the proposed term sheet and to Cross's deposition excerpts. In the deposition excerpts, Cross explained the provisions of the proposed term sheet, stating that it required Woodbury to provide a cash infusion of up to $14,000,000, on which Woodbury would receive a 15% preferred return, and that thereafter all profits would be split 60% to Woodbury and 40% to Rainier. The proposed term sheet provides:

> Profit Sp[l]its: After the Investor and Co-Investor have received [their] Preferred Returns of and on [their] Invested Capital[,] the DST members shall receive 40% of the remaining distributable profits.

Thus—assuming Woodbury actually provided "Invested Capital" to Rainier, which Woodbury did not—it appears that at some point in time in the future, after Woodbury had received its "Preferred Returns of and on its Invested Capital," then Rainier would be eligible to receive 40% of the remaining distributable profits. Rainier points to no summary-judgment evidence of words, actions,

19

payments, or conversations between Rainier and Woodbury purportedly demonstrating the right-to-share-profits-of-the-business partnership-formation factor other than the provisions of the proposed term sheet and the negotiations surrounding it.

Because, as set forth above, the proposed term sheet is not an enforceable contract, its terms cannot constitute an agreement between Rainier and Woodbury to share profits. And, viewing the summary-judgment evidence in the light most favorable to Rainier, no summary-judgment evidence besides the proposed term sheet provision exists of any such profit-sharing agreement.

### b. No Expression of Intent to Be Partners

When analyzing this partnership-formation factor, courts should review the alleged partners' speech, conduct, and writings and consider evidence that is not specifically probative of other partnership-formation factors. *Ingram*, 288 S.W.3d at 899. There must be evidence that both parties expressed their intent to be partners. *Nguyen*, 507 S.W.3d at 372.

Concerning the expression of an intent to be partners, Rainier contends that "the parties' intent is evidenced by the memorialization in the Term Sheet." Rainier also points to the proposed term sheet's repeated use of the term "Partnership" and to the fact that Schulke asked Cross to send the proposed term sheet to Midland as summary-judgment evidence of the parties' intent to be partners. But, as set forth previously, "Partnership" is defined in the proposed term sheet to mean "[a] single purpose limited liability company." Thus, we

20

cannot impose a different meaning on that term—as Rainier asks us to—when it is specifically defined in the proposed term sheet. *See Clark v. Cotten Schmidt, L.L.P.*, 327 S.W.3d 765, 772 (Tex. App.—Fort Worth 2010, no pet.) ("The law applicable to construction of contracts has been applied to partnership agreements."). The proposed term sheet's use of the defined term "Partnership" is no evidence of an intent to form a partnership under chapter 152 of the Texas Business Organizations Code.[11]

In a footnote in its summary-judgment response, Rainier also argued that Woodbury "acknowledged the existence[] of the partnership" when Danny Woodbury, in response to a deposition question about the parties' options following Midland's sale of the loan at public auction, stated that "there could have been some new partnership with Rainier." This statement that the parties could have formed a "new partnership" after the public auction is no evidence that the parties had expressed an intention to form a partnership prior to the public auction.

After reviewing the record in the light most favorable to Rainier, there is no evidence of an expression of an intent to be partners in the business.

---

[11]No matter what name or title it is given, a single purpose limited liability company is a legal entity entirely distinct from a partnership. *See Perez v. Le Prive Enters.*, No. 14-15-00291-CV, 2016 WL 3634298, at *3 (Tex. App.— Houston [14th Dist.] July 7, 2016, no pet.) (mem. op.) ("Much of the Perez brothers' argument appears to confuse the nature of partnerships and limited liability companies, which are distinct entities under Texas law.").

### c. No Right to Participate in Control of the Business

Concerning the right to participate in the control of the business, Rainier does not argue that the summary-judgment evidence supports this partnership-formation factor. Even the proposed term sheet explicitly negates any shared control between Rainier and Woodbury, stating, "Control: The Investor [Woodbury] shall maintain all controls of the Partnership."

Viewing the summary-judgment evidence in the light most favorable to Rainier, there is no evidence of an expression of the right to participate in the control of the business in the proposed term sheet or otherwise.

### d. No Agreement to Share Losses or Liabilities for Third-Party Claims

Concerning an agreement to share losses or liabilities for third-party claims against the business, Rainier does not argue that the summary-judgment evidence supports this partnership-formation factor. Viewing the summary-judgment evidence in the light most favorable to Rainier, there is no evidence of an expression of an intent to share losses or liabilities for third-party claims in the proposed term sheet or otherwise.

### e. Agreement to Contribute Money or Property to the Business

Rainier again points to the proposed term sheet as constituting summary-judgment evidence of the agreed-to-contribute-or-contributed-money-or-property-to-the-business partnership-formation factor. But as set forth above, because the proposed term sheet is not an enforceable contract, its terms cannot constitute

22

an agreement between Rainier and Woodbury to contribute money or property to the business.

Rainier also points to an excerpt from Danny Woodbury's deposition, during which he was asked whether in March 2012 he "anticipated putting as much as $14 million into this project to either acquire the loan or to get a discount and to do other things in connection with the property." Woodbury responded, "That was what we projected, yeah." This evidence—that Woodbury "anticipated" or "projected" putting money into the business—is not evidence that the parties reached an actual agreement to put money into the business.

As summary-judgment evidence of this partnership-formation factor, Rainier argues that it contributed "confidential information and expertise" to the business. Rainier included as summary-judgment evidence testimony and emails demonstrating that it provided "due diligence" information to Woodbury, including financial information relating to the buildings in the portfolio. This summary-judgment evidence of providing information to reach a business deal is no evidence of the partnership-formation factor of an agreement to contribute money or property to the business.

Viewing the summary judgment evidence in the light most favorable to Rainier, there is no evidence that Rainier or Woodbury agreed to contribute money or property to the business.

23

## f. Totality of the Circumstances

Looking to the totality of the partnership-formation factors and the circumstances surrounding Rainier and Woodbury's negotiations, emails, communications, and the business proposal—although not consummated—set forth in the term sheet, and viewing all of the summary-judgment evidence in the light most favorable to Rainier and indulging all reasonable inferences in favor or Rainier, there is less than a scintilla of summary-judgment evidence of any one of the five partnership-formation factors.  Thus, on the partnership-formation continuum, a partnership between Rainier and Woodbury does not exist as a matter of law.  *See Ingram*, 288 S.W.3d at 898; *Rojas*, 393 S.W.3d at 841.  As recognized by the Texas Supreme Court, to hold otherwise "would create a probability that some business owners [Woodbury] would be legally required to share profits with individuals or be held liable for the actions of individuals who were neither treated as nor intended to be partners [Rainier]."  *See Ingram*, 288 S.W.3d at 898 (stating that in creating the five statutory partnership-formation factors, "[t]he [l]egislature does not indicate that it intended to spring surprise or accidental partnerships on independent business persons").

Because based on the summary-judgment record before us, applying either contract-formation principles or section 152.025(a)'s partnership-formation factors, reasonable and fair-minded persons could not differ in their conclusion that no enforceable written partnership agreement existed between Rainier and Woodbury, that none of the statutory partnership-formation factors exist, and that

24

no non-written partnership existed between Rainier and Woodbury, the element of a partnership between Rainier and Woodbury—that is an essential element of Rainier's breach of fiduciary duty claim—fails. *See Hamilton*, 249 S.W.3d at 426 (citing *City of Keller*, 168 S.W.3d at 822). Consequently, the trial court properly granted Woodbury's no-evidence motion for summary judgment on Rainier's breach-of-fiduciary-duty claim. *See Lindley*, 349 S.W.3d at 124.

We overrule Rainier's first through fourth issues.

## V. SUMMARY JUDGMENT ON CONTRACT CLAIM NOT REVERSIBLE ERROR

In its fifth and sixth issues, Rainier argues that the trial court erred by granting summary judgment on its breach-of-contract claim because Woodbury did not expressly seek summary judgment on that claim.[12]

A trial court cannot grant summary judgment on grounds not presented in the motion for summary judgment. *See* Tex. R. Civ. P. 166a(c); *G & H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011) ("Granting a summary judgment on a claim not addressed in the summary[-]judgment motion therefore is, as a general rule, reversible error."). However, "[a]lthough a trial court errs in granting

[12]Woodbury argues that Rainier waived this complaint because Rainier did not raise it in the trial court. But, as noted by Rainier, a party need not object in the trial court to a summary judgment made on grounds not expressly presented in the summary-judgment motion. *See McConnell v. Southside Indep. School Dist.*, 858 S.W.2d 337, 342 (Tex. 1993) ("Even if the non-movant fails to except or respond, if the grounds for summary judgment are not expressly presented in the motion for summary judgment itself, the motion is legally insufficient as a matter of law."). We will thus entertain Rainier's argument that summary judgment was improper on its breach-of-contract claim because Woodbury did not expressly seek summary judgment on that claim.

25

a summary judgment on a cause of action not expressly presented by written motion . . . the error is harmless when the omitted cause of action is precluded as a matter of law by other grounds raised in the case." *G & H Towing*, 347 S.W.3d at 297–98.

We have carefully reviewed Woodbury's motion for summary judgment. Therein, Woodbury stated (mistakenly) that Rainier's "sole claim against Woodbury [was] for breach of fiduciary duty." Woodbury also stated (mistakenly) that "[n]otably, [Rainier] ha[d] not sued Woodbury for breach of contract."[13] Given those statements—and the lack of any language expressly addressing Rainier's breach-of-contract claim—we agree with Rainier that Woodbury did not expressly move for summary judgment on Rainier's breach-of-contract claim.

While Woodbury did not expressly seek summary judgment on Rainier's breach-of-contract claim, Woodbury did argue, in conjunction with its attack on Rainier's breach-of-fiduciary-duty claim, that Rainier had no evidence that a valid partnership existed between Woodbury and Rainier. Woodbury's motion stated that "there [was] no evidence that a partnership agreement was ever executed." Woodbury then listed the essential elements of a valid contract and stated that "there [was] no evidence" of any of the factors, including no evidence of

_____

[13]Woodbury's mistaken belief that Rainier had not brought a breach-of-contract claim against it likely stems from the fact that Rainier's initial pleading did not include a breach-of-contract claim against Woodbury. Rainier's first amended petition—which was filed almost two years prior to Woodbury's summary-judgment motion—added the claim against Woodbury for breach of contract.

26

"[a]cceptance in strict compliance with the terms of the offer . . . and [e]xecution and delivery of the contract with the intent that it be mutual and binding."[14] In its summary-judgment response, Rainier likewise discussed the essential elements of a valid contract, and it argued that "there [was] ample summary[-]judgment evidence to create a genuine issue of fact as to all five elements." Rainier then offered evidence to support its argument that it entered into a valid contract with Woodbury.

Here, Rainier's breach-of-fiduciary-duty claim was premised on the existence of a partnership relationship between Rainier and Woodbury. And Woodbury's no-evidence summary judgment motion specifically alleged no evidence existed of a partnership agreement between Rainier and Woodbury as the challenged element of Rainier's breach-of-fiduciary-duty claim. As discussed above in our disposition of Rainier's breach of fiduciary duty claim, no evidence exists of a partnership agreement between Rainier and Woodbury. *See Brown*, 173 S.W.3d at 588 (requiring a valid contract to be accepted and executed and delivered with the intent that it be mutual and binding). Thus, although the trial court erred by granting summary judgment on Rainier's breach-of-contract claim because Woodbury did not expressly seek summary judgment on that claim,

---

[14]In its traditional motion for summary judgment, Woodbury stated that "[t]he evidence conclusively negate[d] essential elements of a legally enforceable contract or an agreement" and that "Rainier never accepted the Term Sheet or the property management agreement[,] and there was no agreement to form a partnership."

such error is harmless because "the omitted cause of action is precluded as a matter of law by other grounds raised in the case."[15] *G & H Towing*, 347 S.W.3d at 297–98; *see Krakauer v. Wells Fargo Bank, N.A.*, No. 02-14-00273-CV, 2016 WL 5845924, at *4 (Tex. App.—Fort Worth Oct. 6, 2016, no pet.) (mem. op.) ("[E]ven though the trial court granted summary judgment on the trust fund doctrine claims—which were not specifically addressed in the Bank's summary[-] judgment motion—the error was harmless because the Bank moved for summary judgment on an element common to these claims—the nature of the funds on deposit—on which the trial court found in favor of the Bank."). Whether we apply contract principles as urged by Woodbury or section 152.052's partnership-formation factors as urged by Rainier, no evidence exists of the establishment of a partnership between Woodbury and Rainier, and consequently, summary judgment for Woodbury was proper on both Rainier's breach-of-fiduciary-duty claim and breach-of-the-alleged-term-sheet-partnership-contract claim. *See Ingram*, 288 S.W.3d at 892 n.1 (finding it unnecessary to address challenges to finding of no breach of fiduciary duty when no evidence of partnership existed);

---

[15]The "existence of a valid contract" is an essential element of a breach-of-contract claim. *Rice v. Metro. Life Ins. Co.*, 324 S.W.3d 660, 666 (Tex. App.—Fort Worth 2010, no pet.). Because the proposed term sheet—which forms the basis of Rainier's breach-of-contract claim—is not a valid contract, summary judgment on Rainier's breach-of-contract claim is proper. *See Schindler v. Baumann*, 272 S.W.3d 793, 795 (Tex. App.—Dallas 2008, no pet.) (holding that "[a]bsent any evidence of a valid contract between appellants and Baumann, the trial court did not err in granting summary judgment against appellants on their breach[-]of[-]contract claim").

28

*Citrin Holdings, LLC v. Minnis*, No. 14-11-00644-CV, 2013 WL 1928652, at *16 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (mem. op) (holding no partnership agreement existed under either contractual analysis or statutory partnership-formation analysis and that, therefore, alleged partner's claims for breach of partnership contract and breach of fiduciary duty failed).

We overrule Rainier's fifth and sixth issues.

## VI. SUMMARY JUDGMENT PROPER ON REQUEST FOR CONSTRUCTIVE TRUST AND EXEMPLARY DAMAGES

In its seventh and eighth issues, Rainier contends that the trial court erred by determining that there was no genuine issue of material fact to support the imposition of a constructive trust and exemplary damages. A constructive trust is a remedy, not a cause of action. *Dawson v. Lowrey*, 441 S.W.3d 825, 837 n.20 (Tex. App.—Texarkana 2014, no pet.); *LTTS Charter Sch., Inc. v. Palasota*, 362 S.W.3d 202, 209 (Tex. App.—Dallas 2012, no pet.). And an exemplary damages claim will not stand alone; it depends on a pleaded liability claim. *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 860 (Tex. App.—Fort Worth 2005, no pet.). Because summary judgment was properly granted on Rainier's breach-of-fiduciary-duty and breach-of-contract claims—the only liability claims brought by Rainier—summary judgment was also proper as to Rainier's request for the imposition of a constructive trust and exemplary damages. *See Dawson*, 441 S.W.3d at 837 n.20; *LTTS Charter Sch.*, 362 S.W.3d at 209; *Everett*, 178 S.W.3d at 860.

29

We overrule Rainier's seventh and eighth issues.

## VII. CONCLUSION

Having overruled Rainier's eight issues, we affirm the trial court's judgment.

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL: WALKER and MEIER, JJ.; and CHARLES BLEIL (Senior Justice, Retired, Sitting by Assignment).

DELIVERED: December 7, 2017